# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                          MASTER FILE NO. 12-md-02311


_____

In Re: Occupant Safety Systems                HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:


Dealership Actions                            2:12-cv-00602
End-Payor Actions                             2:12-cv-00603
_____/

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANTS' COLLECTIVE
## MOTION TO DISMISS INDIRECT PURCHASER ACTIONS

Before the Court is Defendants' Collective Motion to Dismiss End-Payor Plaintiffs'

Consolidated Amended Class Action Complaint (Doc. No. 65 in 12-603), and

Automobile Dealer Plaintiffs' Consolidated Class Complaint (Doc. No. 62 in 12-602).

Defendant movants include TRW Automotive Holdings Corp., TRW Deutschland

Holding GMBH, TRAM, Inc., Tokai Rika Co., Ltd., Autoliv Inc., Autoliv ASP, Inc., Autoliv

B.V. & Co., KG, Autoliv Japan Limited, Autoliv Safety Technology, Inc.[1], Takata

_____

[1]Autoliv Inc., Autoliv ASP, Inc., Autoliv B.V. & Co., KG, Autoliv Japan Limited, Autoliv Safety Technology, Inc. have reached a proposed settlement with the Automobile Dealer Plaintiffs and the End-Payor Plaintiffs. (Doc. No. 73 in 12-602; Doc. No. 83 in 12-603). On September 21, 2014, the Court granted Autoliv Defendants' request to withdraw from these motions without prejudice. (Doc. No. 95 in 12-600). In addition, TRW Deutschland Holding GMBH and TRW Automotive Holdings Co. have

Corporation, and TK Holdings.  In their motion, Defendants challenge the sufficiency of

the allegations of conspiracy to fix prices on products filed by two different groups of

plaintiffs–automobile dealers and end-payors.

## I.  INTRODUCTION

Automobile Dealer Plaintiffs and End-Payor Plaintiffs (collectively "Indirect

Purchaser Plaintiffs" or "IPPs") bring class actions against Defendants under federal

and state law based on Defendants' alleged conspiracy to fix prices and allocate the

market for Occupant Safety Restraint Systems ("OSS").  On July 3, 2013, Automobile

Dealer Purchaser Plaintiffs filed their Consolidated Class Complaint, (Doc. No. 55 in 12-

602), and on June 3, 2013, End-Payor Plaintiffs filed their Consolidated Amended Class

Action Complaint (Doc. No. 58 in 12-603).  Defendants manufacture or sell Occupant

Safety Restraint Systems in the United States, which are installed by automobile

original equipment manufacturers ("OEMS") in new cars and to replace worn out,

defective or damaged OSS.  (Doc. No. 55 at ¶ 128).  The Automobile Dealer Plaintiffs

("ADPs"), "filed their Consolidated Class Complaint on behalf of themselves and all

others similarly situated."  (Doc. No. 55 in 12-502).  In their proposed class action,

Automobile Dealer Plaintiffs allege that "manufacturers and suppliers of automotive

Occupant Safety Restraint Systems, globally and in the United States" engaged in "a

lengthy conspiracy to suppress and eliminate competition" in the OSS industry by

agreeing to rig bids for, and to fix, stabilize, and maintain the prices of these pro-

ducts. . . ."  (Doc. No. 55 in 12-602 at ¶ 1).

---

moved for preliminary approval of a proposed settlement with End-Payor Plaintiffs.
(Doc. No. 84 in 12-603).

In their Corrected Consolidated Amended Class Action Complaint (Doc. No. 70 in 12-603), End-Payor Plaintiffs ("EPPs"), on behalf of themselves and all others similarly situated, "bring a class action against Defendants, suppliers of Automotive OSS. . .globally and in the United States, for engaging in a massive conspiracy to unlawfully fix and artificially raise the prices" of OSS.   (Doc. No. 58 in 12-603 at ¶ 1).

In their motion, Defendants challenge the sufficiency of the complaints, asserting that the facts alleged do not support the existence of a global conspiracy by all Defendants over a six-year period.  Defendants also argue that Indirect Purchaser Plaintiffs lack standing, and that all state claims must be dismissed for a variety of reasons.

Defendants waived oral argument on the motion, which was scheduled for June 4, 2014.  The Court has reviewed all of the filings, and for the reasons that follow, the motion is **GRANTED in part** and **DENIED in part**.

## II.  SUMMARY OF THE FACTUAL ALLEGATIONS

According to their complaints, Indirect Purchaser Plaintiffs purchased OSS indirectly from Defendants and their co-conspirators as part of purchasing or leasing a new vehicle or as a replacement when repairing a damaged vehicle during the Class Period, from March 2006 to the time Defendants' unlawful conduct ceased. (Doc. No. 55 at ¶ 3; Doc. No. 58 at ¶ 2).  OSS include parts in an automotive vehicle that protect drivers and passengers from bodily harm--seat belts, airbags, steering wheels, and safety electronic systems.  (Doc. No. 55 at ¶ 2; Doc. No. 58 at ¶ 3).

3

Indirect Purchaser Plaintiffs identify several groups of Defendants:  the TRW Defendants (Doc. No. 55 at ¶¶ 106-108; Doc. No. 58 at ¶¶ 71-72), which includes TRW Automotive Holdings Corp. and TRW Deutschland Holding GMBH ("TRW Germany"); the Takata Defendants  (Doc. No. 55 at ¶¶ 109-113; Doc. No. 58 at ¶¶ 64-65), which includes Takata Corporation and TK Holdings, Inc. ("TK"); the Autoliv Defendants, which includes Autoliv, Inc., Autoliv ASP., Autoliv B.V. & Co. KG Inc., Autoliv Japan Ltd., (Doc. No. 55 at ¶¶ 114-118; Doc. No. 58 at ¶¶ 66-68); the Tokai Rika Defendants, which includes Tokai Rika Co., Ltd. and TRAM, Inc.,  (Doc. No. 55 at ¶¶ 119-123; Doc. No. 58 at ¶¶ 69-70).

IPPs include allegations about Defendants' size and global sales, conditions in the market that are conducive to antitrust conspiratorial conduct, and the numerous opportunities to conspire presented by industry trade shows.  According to IPPs, a small number of manufacturers, including Defendants, dominate the Automotive OSS market. (See e.g. Doc. No. 55 at ¶ 108).   The top three suppliers control nearly 75 percent of the U.S. market.  (Doc. No. 55 at ¶ 123).

 IPPs allege that the market structure is conducive to price-fixing and market allocation.  There are significant barriers to entry in the market for OSS.  The complaints detail structural characteristics of the OSS industry, including high start-up costs due to the costs associated with manufacturing plants, equipment, energy, transportation, distribution infrastructure, and skilled labor.  (Doc. No. 55 ¶¶ 149-159; Doc. No. 58 ¶¶ 94-105).  In addition, demand is inelastic, and Defendants own patents for OSS.  (Doc. No. 55 at ¶ 154).

4

Lastly, IPPs allege that the OSS market is highly concentrated. The global market for OSS in 2010 was $18.1 billion, and the North American market for OSS was $4.2 billion. (Doc. No. 55 at ¶ 138; Doc. No. 58 at ¶ 82). The global OSS market is dominated and controlled by large manufacturers, the top three of which are Defendants who control almost 75% of the market. (Doc. No. 55 at ¶ 158). Autoliv Defendants account for more than 33% of the global market for OSS, and Autoliv identifies itself as "the world's largest automotive safety supplier with sales to all the leading car manufacturers in the world." (Id.) TRW Defendants account for approximately 20% of the global market for OSS, and Takata Defendants account for approximately 20% of the OSS global market. (Doc. No. 55 at ¶ 139; Doc. No. 58 at ¶ 83). In 2012, the total dollar-value of airbags sold in the U.S. reached $6.7 billion. (Doc. No. 55 at 141-42; Doc. No. 58 at ¶ 89). In 2012, the total dollar-value of seatbelts sold in the U.S. reached over $900 million, and Autoliv, TRW, and Takata are major manufacturers. (Doc. No. 55 at ¶ 145; Doc. No. 58 at ¶ 89). The same is true for steering wheels and related components, for which U.S. sales in 2012 reached $2.24 billion. (Doc. No. 55 at ¶ 148; Doc. No. 58 at ¶ 92).

IPPs further allege that Defendants and their co-conspirators had opportunities to conspire. For example, Defendants can meet privately at trade shows. (Doc. No. 55 at ¶ 159). According to a June 6, 2012, press release by the DOJ, Autoliv and its co-conspirators met in secret and agreed to allocate the supply of various automotive parts. (Doc. No. 55 at ¶ 159; Doc. No. 58 at ¶ 105). They participated in meetings, conversations and communications to discuss and agree on the bids and price quotations to be submitted to certain automobile manufacturers for OSS, and also

5

agreed to allocate the supply of OSS sold to certain automobile manufacturers on a model-by-model basis.  (Id.)  Autoliv, TRW, and Takata Defendants have admitted that they are cooperating with the antitrust investigators.  (Doc. No. 55 at ¶ 162; Doc. No. 58 at ¶ 108).

Finally, IPPs advance allegations about the investigations in the United States. Autoliv, Inc. pleaded guilty to conspiring to fix prices, rig bids, and allocate markets with respect to OSS from March 2006 to at least February 2011, and paid a $14.5 million fine.  (Doc. No. 55 at ¶¶ 8, 168-171; Doc. No. 58 at ¶¶ 7, 113).  TRW Deutschland pleaded guilty to a two-count indictment involving a conspiracy to fix prices for seatbelts, steering wheels, and airbags, and agreed to pay a $5.1 million fine.  (Doc. No. 55 at ¶ 9, 172-175).  In addition, although IPPs did not include allegations about Takata Corporation's agreement to plead guilty in their complaints, Defendants acknowledge that Takata Corporation has agreed to plead guilty to participation in a conspiracy involving fixing prices and rigging bids on products in the OSS conspiracy from 2003 until at least February 2011, (see United States v. Takata Corporation, Information, No. 2:13-cr-20741-GCS-PJK (October 9, 2013)), and agreed to pay $71.3 million for its participation in the conspiracy.  In addition to these guilty pleas, as alleged in IPPs' Complaints, a leniency applicant under the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") is likely in this case, given the global nature of the conspiracy and its ever-expanding reach into new automotive parts.  (Doc. No. 55 at ¶¶ 182-183; Doc. No. 58 at ¶¶ 114-115).

In their Motion to Dismiss End-Payors' complaint and Automobile Dealers' complaint in their entirety, Defendants challenge the sufficiency of the antitrust

6

allegations, standing, and whether the Indirect Purchaser Plaintiffs can bring claims under the antitrust laws, the consumer protection laws, and the unjust enrichment laws of various states.

## III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint when it fails "to state a claim upon which relief can be granted."  When reviewing a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, "'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'"  Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Under Iqbal, a civil complaint will only survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. . . .  Exactly how implausible is 'implausible' remains to be seen, as such a malleable standard will have to be worked out in practice."  Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629-630 (6th Cir. 2009).

**IV.  ANALYSIS**

    **A.  Procedural Background**

When the United States Judicial Panel on Multidistrict Litigation ("Judicial Panel" or "Panel")  transferred actions sharing "factual questions arising out of an alleged conspiracy to inflate, fix, raise, maintain, or artificially stabilize prices of automotive wire harness systems" to the Eastern District of Michigan, (12-md-02311, Doc. No. 2), in February 2012, it is unlikely that the the scope and extent of antitrust conspiratorial conduct in the automotive component parts industry was on the radar.  Even after the Judicial Panel expanded MDL No. 2311 in June 2012 to include alleged conspiracies to fix the prices of three additional components it is unlikely that the Panel could foresee the inclusion of twenty-five additional component part cases.  Although the Judicial Panel predicted centralizing litigation in this District would eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve resources, the Court finds that conserving the Court's resources requires a more streamlined approach in resolving collective motions to dismiss.  The Court already has addressed these arguments because the defendants in the four component part cases advanced many of the same arguments and relied on much of the same authority albeit in differing factual backdrops.

Accordingly, those arguments raised in this motion that have been addressed in the Court's prior rulings on motions to dismiss other component part complaints by indirect purchasers will not be addressed in this opinion.

8

**B. Sufficiency of the Antitrust Allegations**

Defendants characterize the complaints as reaching too far based on the limited scope of the guilty pleas that have been entered in this case. The Court disagrees and finds Defendants' efforts to distinguish the allegations regarding this conspiracy from those deemed sufficient in prior component parts are not persuasive. Defendants correctly articulate the limits of the guilty pleas that have been entered relative to OSS, including the limited number of targeted OEMs, the number of parts folded within the definition of OSS and their lack of interchangeability, and the fact that Defendants may not sell all of the parts included in OSS or have not pleaded guilty. Nevertheless, the factual allegations create "a reasonable expectation that discovery will reveal evidence of illegal agreement" beyond those parties that have pleaded guilty and beyond the extent admitted by Autoliv Defendants, TRW Deutschland, or Takata. Twombly, 550 U.S. at 556. Accord In re Polyurethane Foam Antitrust Litig., 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (relying on "specific admissions" made during a governmental investigation that supported the "existence of a conspiratorial agreement" as opposed to government investigations coupled with parallel conduct); See Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 454-55 (6th Cir. 2011) (observing that when "a complaint specifically alleges an express agreement to restrain trade and conduct by defendants consistent with the agreement, a defendant cannot prevail at the pleading stage by offering alternative explanations for the allegedly unlawful behavior").

In addition to the factual allegations regarding these Defendants, the allegations relating to a leniency applicant, and the allegations about the market conditions conducive to antitrust conspiratorial conduct, in particular the domination of the market

by three Defendant groups, the market structure and barriers to entry into the market, the Court finds an inference arises that the market conditions allowed an antitrust conspiracy to flourish for six years.  See e.g. In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d at 1014 ("oligarchic sellers" and "prohibitive entry barriers" conducive to collusion).  These are the types of allegations deemed sufficient in Standard Iron Works v. ArcelorMittal, 639 F. Supp. 2d 877, 883 (N.D. Ill. 2009).  In that case, the plaintiffs alleged that the steel market in the United States was conducive to an antitrust conspiracy given "significant barriers to entry, including high capital requirements and regulatory barriers."  Id.  The plaintiffs also alleged that restrains in place on imported steel, including transportation costs, "trade duties, and currency exchange rates" protected domestic producers from foreign competition and allowed the domestic producers to raise prices. Id.  Likewise, in this case, the market conditions support an inference that the conspiracy encompassed entities beyond those pleading guilty and beyond their admitted targets.

Lastly, the Court recognizes that the OSS investigation grew out of a broader investigation into the auto parts industry generally, an industry rife with price-fixing. Many of the companies pleading guilty to bid-rigging, price-fixing, and market allocation of automotive parts during this same time frame had multiple OEMS as targets so guilty pleas in OSS component parts are not the only basis upon which to assess the sufficiency of the complaints.  The complaints include allegations about Tokai Rika's guilty plea to obstruction of justice in the heater control panels, and numerous other guilty pleas in component part cases.

Further, OSS Defendants have numerous OEM customers.  TRW's main

10

customers include: GM, Chrysler, Ford, Mercedes, Renault, Nissan, Fiat, Toyota, BMW,

Honda, Hyundai, and Volkswagen. (Doc. No. 55 at ¶ 132)  Takata's main customers

include: Toyota, Honda, BMW, Mazda, Nissan, GM, Chrysler, and Ford. (Doc. No. 55 at

¶ 133).  Autoliv's main customers include: GM, Ford, Nissan, Renault, Hyundai, Kia,

VW, Chrysler, Fiat, Honda, Toyota, BMW, Mercedes, Daimler, and Volvo. (Doc. No. 55

at ¶ 134).  Tokai Rika's main customers include: Toyota, Subaru, SAAB, Volvo, Nissan,

Isuzu, GM, Ford, Suzuki, Mazda, Mitsubishi, and Chrysler. (Doc. No. 55 at ¶ 135).

Therefore, even though the United States guilty pleas do not include admissions that

multiple OEMs were targeted, the Court finds that all of the conduct by various

defendants named in MDL 2311 is relevant to support the existence of the OSS

conspiracy.  See e.g. In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1149

(N.D. Cal. 2009) (addressing how an earlier conspiracy might create an inference

strengthening the existence of a latter conspiracy).  Notably, in United States v.

Andreas, 216 F.3d 645 (7th Cir. 2000), the appellate court acknowledged that "evidence

concerning a prior conspiracy may be relevant and admissible to show the background

and development of a current conspiracy."  In re Flash Memory, 643 F. Supp. 2d at

1149.  Here, the component parts in the MDL involve allegations of a similar scheme in

each part, and thus, provide context as to how the. . .conspiracy operated.  Andreas,

216 F.3d  at 665; see also High Fructose, 295 F.3d at 661 (same); In re Static Random

Access Memory (SRAM) Antitrust Litig., 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008)

(recognizing that guilty pleas in the earlier litigation did not support the existence of the

second conspiracy on their own, but finding the guilty pleas did "support an inference of

a conspiracy in the related industry").

11

In sum, in assessing the complaints as a whole, the Court finds that they allege an express agreement existed to fix prices and allocate customers in a market with conditions ripe for conspiratorial conduct.  Despite Defendants' characterization to the contrary, these complaints bear no resemblance to the typical complaint found lacking under Twombly.  See Starr v. Sony BMG Music Entm't, 592 F.3d 314, 324 (2d Cir. 2010) (observing that courts dismissed complaints alleging generic conduct or complaints advancing only legal conclusions).  Accord Standard Iron Works, 639 F. Supp. 2d at 883.  Accordingly, the Court denies Defendants' request to dismiss the complaints based upon the sufficiency of the allegations and considers Defendants' argument that constitutional standing is lacking.

### C.  Constitutional Standing

The parties dispute whether IPPs have satisfied the constitutional requirement for standing; specifically, whether each plaintiff alleged a "personal injury fairly traceable to the defendant's allegedly unlawful conduct" that is "likely to be redressed by the requested relief."  Allen v. Wright, 268 U.S. 747, 751 (1984).   Defendants assert that the standing requirement is not satisfied under any state law invoked by IPPs because IPPs have not alleged facts to establish that they suffered an injury-in-fact and that IPPs lack standing to proceed in states where no plaintiff resides.  The Court had addressed these arguments in other component part cases and finds no grounds for reaching a different conclusion on the sufficiency of the allegations.

### 1.  Injury-in-fact

12

To demonstrate Article III standing, a plaintiff must first allege that he has suffered an injury that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Second, the alleged injury must be fairly traceable to the defendant's conduct, and not the result of the independent action of a third party.  Id.  Third, the plaintiff must allege that a favorable federal court decision is likely to redress the alleged injury.  Id. at 561.

Because ADPs and EPPs are indirect purchasers, their complaints must include two allegations: (1)  Defendants overcharged the direct purchasers; and (2) some or all of the overcharge was passed on to them through each of the various intermediate levels of the distribution chain.  See In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478, 502 (N.D. Cal. 2008) ("In re GPU") (observing that "indirect purchasers must prove that an overcharge was levied on direct purchaser of the defendants' products, who then passed all or some of that overcharge through to the indirect purchasers"); D.R. Constr., Co. v. Rohm & Haas Co., 470 F. Supp. 2d 485, 492-93 (E.D. Pa. 2006) (finding that the plaintiffs' allegations "that they paid inflated prices for products with plastics additives due to an overcharge on plastics additives which was passed on to them from the intervening links within the distribution chain, that plaintiffs' overpayment for products containing plastics additives was caused by the conspiracy among defendants to charge inflated prices for plastics additives, and that judicial relief will compensate plaintiffs for these injuries, restoring plaintiffs to the position they were in prior to the price-fixing scheme" satisfied standing).

Even in the absence of allegations as to what particular parts were purchased

13

from whom, the allegations in the complaints satisfy IPPs' pleading burden.  See

Precision Assoc., Inc. v. Panalpina World Transp., (Holding) Ltd., CV-08-42 JG VVP,

2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) report and recommendation adopted,

08-CV-00042 JG VVP, 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014) (holding that antitrust

plaintiffs need not "allege which defendants they made purchases from because they

need not establish standing as to specific defendants in an antitrust suit").  Specifically,

EPPs have alleged that they purchased indirectly from one or more of Defendants

during the Class Period.  (Doc. No. 58 at ¶¶ 19-63).   ADPs have alleged the brands of

vehicles they sell, and each is manufactured by an OEM supplied by one or more of the

Defendants.  (Doc. No. 55 at ¶¶ 20-105. 132-135).  The complaints detail how OSS

follow a traceable path through the distribution chain and that overcharges for OSS

were passed through that distribution chain from OEMs to Auto Dealers and

End-Payors.  (Doc. No. 55 at ¶¶ 185-86). They allege a physical chain of distribution

from Defendants to Plaintiffs and that the costs are traceable.  (Doc. No. 55 at ¶ 200(e);

Doc. No. 58 at ¶ 140).  IPPs allege that they paid supracompetitive prices because of

the conspiracy.  (Doc. No. 55 at ¶¶ 213, 253(a)(4), 254(a)(4); Doc. No. 58 at ¶¶

173(a)(4), 175(a)(4), 176(a)(4), 177(a)(4)).

    According to IPPs, Defendants' anticompetitive conduct harmed businesses and

impacted the prices that consumers paid for new vehicles.  (Doc. No. 55 at ¶¶ 200-213;

Doc. No. 58 at ¶¶ 137-141).  The Department of Justice ("DOJ")  has commented

repeatedly on the harm that the conspiracy caused businesses and consumers.  (Doc.

No. 50 at ¶¶ 184; Doc. No. 58 at ¶¶ 124-126).

     In sum, the Court finds IPPs have met their pleading burden.  See In re

14

Processed Egg Prod. Antitrust Litig., 851 F. Supp. 2d 867, 887 n.15 (E.D. Pa. 2012) (addressing the indirect purchaser plaintiffs' allegation that they paid supracompetitive prices for shell eggs and egg products); Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., 09-CV-00852 2012 WL 3841397 at *4 (E.D. Wis. Sept. 5, 2012) (indirect purchasers alleging they are participants in the AM parts market, because they are "end users of AM parts, and that they are being injured because the higher prices defendants charge for AM parts are being passed on to end users by direct purchasers and others in the chain of distribution paid inflated prices" satisfied Article III standing requirements).

### 2. Residency

Next, the parties disagree as to whether Indirect Purchaser Plaintiffs have standing to pursue claims in states where they do not reside.  According to Defendants, no Automobile Dealer Plaintiff resides in or, consequently, suffered an injury in North Dakota.  In the previous opinions addressing this argument by indirect purchasers, the Court distinguished the authority relied upon by Defendants and deemed it unpersuasive.   See e.g. In re Refrigerant Compressors Antitrust Litig., No. 09-md-02042, 2012 WL 2917365 (E.D. Mich. July 17, 2012) (holding that the antitrust class action plaintiffs had no standing to sue in states where no would-be representative of the plaintiff class lived or allegedly was injured) (citing In re Packaged Ice Antitrust Litig., 779 F. Supp. 2d 657 (E.D. Mich. 2011)).

North Dakota does not require in-state residency to state a claim.  See In re Processed Egg Products, 851 F. Supp. 2d at 889-891.  Consequently, the Court denies their motion to dismiss these claims on the basis of lack of residency.

15

Further, as this Court recognized in prior decisions in MDL 2311, even though standing generally is determined at the outset of a case, see Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 433 F.3d 181, 197-98 (2d Cir. 2005), exceptions exist.  See Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999); Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 612 (1997) (postponing the standing determination until after a class certification ruling because the certification issues are "logically antecedent to Article III concerns").  The Court recognizes that the Sixth Circuit has not decided the applicability, if any, of Ortiz and Amchem to an indirect purchaser antitrust class action; however, the Sixth Circuit has applied the same rationale to an ERISA class action law suit.  See Fallick v. Nationwide Ins. Mut. Co., 162 F.3d 410 (6th Cir. 1998).  This Court finds no basis to alter its previous conclusion that the rationale is persuasive.  Because the Court finds that IPPs have standing to proceed with their state law claims, it considers Defendants' challenge to the viability of the state law claims on other grounds.

### D. Availability of Relief under State Law

IPPs advance claims based on antitrust, consumer protection, and unjust enrichment laws of various states.  Defendants argue for dismisssal based upon the limitations period applicable to each state antitrust, consumer protection, and unjust enrichment claim governing the timeliness of IPPs causes of action.  The statutes of limitations range from three to six years.  Defendants contend that any violation prior to June 8, 2012, is barred by the applicable statute of limitations.

EPPs allege that they did not discover their claims or facts sufficient to place

them on notice of the claims until February 2011, when announcements of the government investigations into OSS price-fixing became public.  (Doc. No. 58 at ¶¶ 143-146).  ADPs allege that they could not have discovered the OSS conspiracy until Autoliv's agreement to plead guilty became public on June 6, 2012. (Doc. No. 55 at ¶¶ 214-219).  IPPs allege that lack of any basis upon which they could have discovered their claims prior to these dates kept the statute of limitations from running.

In the alternative, IPPs allege that the doctrine of fraudulent concealment applies.  The Court agrees that to the extent that the doctrine is applicable, the complaints here have alleged facts to support the elements.  A plaintiff must plead three elements to establish fraudulent concealment:

> (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.

Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975).  A plaintiff must plead the factual allegations underlying a claim of fraudulent concealment with particularity.  Friedman v. Estate of Presser, 929 F.2d 1151, 1160 (6th Cir. 1991).  IPPs allege that they had no knowledge of the conspiracy until July 2011 because of Defendants' affirmative concealment.  (Doc. No. 55 at ¶ 225-227; Doc. No. 58 at ¶¶ 151-153).  IPPs also allege that they did not discover the conduct nor were their facts prompting an inquiry.  (Id.)   Defendants met in secret to accomplish their scheme, which was executed through the submission of rigged bids to OEMs to promote the impression of competition. (See Doc. No. 55 at 1, 6, 8, 154, 168, 172, 176, 179, 218, 222, 223, 247; Doc. No. 58 at 1, 5, 7, 105, 113, 116, 117, 146).  Moreover, IPPs argue

17

that even law enforcement was unaware until well into the Class Period because there was no conduct provoking an inquiry.  (Doc. No. 55 at ¶ 218; Doc. No. 58 at ¶ 146). Notably, the allegations found to be sufficient for wrongful concealment in Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 446-47 (6th Cir. 2012), were not extensive.  In that case, the  plaintiffs relied on findings from the European Commission that conspirators "established security rules to prevent a paper trail. . .and used a coding-system to hide the identity of the producers in their documents and spreadsheets."  Id. at 447.  These allegations satisfied the Sixth Circuit, inasmuch as they demonstrated "active steps to hide evidence, as opposed to simply meeting in secret."  Id. at 447 (citing Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883, 891 (6th Cir. 2004) (explaining that "hiding evidence" can constitute affirmative concealment)).

The Court found similar allegations sufficient to demonstrate wrongful concealment in other component part cases, see e.g. In re Auto. Parts Antitrust Litig., 12-MD-02311, 2013 WL 2456584 (E.D. Mich. June 6, 2013), and Defendants have not provided grounds for distinguishing the situation here from the decision in those cases. Accordingly, the Court denies Defendants' request to dismiss on statute of limitations grounds.

### 1.  Antitrust Claims

Indirect Purchaser Dealer Plaintiffs advance state antitrust claims under the laws of Arizona, California, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts[2], Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York,

---

[2]EPPs do not oppose dismisssal of their Massachusetts antitrust claim.

18

North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia.  Defendants raise several grounds for dismissal, including, standing for component parts purchasers, the sufficiency of the nexus between conduct and interstate commerce, and availability of class action antitrust claims.

### a.  Antitrust Standing for Component Parts Purchasers

In  response to the prohibition against antitrust actions by indirect purchasers set forth by the Supreme Court in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), many states enacted repealer provisions, allowing state actions for indirect purchasers.  In California v. ARC Am. Corp., 490 U.S. 93, 105-06 (1989), the Supreme Court held that federal law does not preempt state indirect purchaser statutes.

Nevertheless, courts are required to determine whether a particular plaintiff is a proper party to bring a private antitrust action.  NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (observing that antitrust claimant must show more than mere "injury causally linked" to a competitive practice).   In its decision in Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 (1983) ("AGC"), the Supreme Court interpreted the Clayton Act provision permitting recovery by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."  The Court concluded that even when a plaintiff plausibly alleges an injury-in-fact sufficient for constitutional standing, the plaintiff still must establish antitrust standing.  "It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property."  Id. (quoting Blue

19

Shield of Virginia, Inc. v. McCready, 457 U.S. 465, 477 (1982)).

In AGC, the Supreme Court articulated a number of factors that courts should consider in analyzing the relationship between a plaintiff's harm and a defendant's wrongdoing:  (1) the causal connection between the violation and the harm, and whether the harm was intended; (2) the nature of injury and whether it was one Congress sought to redress; (3) the directness of the injury, and whether damages are speculative; (4) the risk of duplicate recovery or complexity of apportioning damage; and (5) the existence of more direct victims.  AGC, 459 U.S. at 537-45.  A plaintiff need not prevail on every factor; instead, the courts balance the factors, "giving great weight to the nature of the plaintiff's alleged injury."  Id.

This Court concluded in the prior component part cases that the issue of applicability of AGC is one that is governed by state law because this Court is sitting in diversity.  Erie R.R. v. Tompkins, 304 U.S. 64 (1938).  Defendants concede that the allegations in this case are substantially similar to those deemed by the court to meet AGC in other component part cases, but urge the Court to reconsider. Again, the Court finds that the AGC factors do not undermine standing.  Because there is no material distinction between the allegations made in the prior component part cases and those allegations made relative to OSS, the Court finds no reason to alter the conclusion it reached in resolving this issue in previous parts.  Notably, the Court finds the first factor, whether IPPs suffered an antitrust injury, satisfied because even though IPPs may not be direct participants in the OSS market, they purchased vehicles containing OSS or purchased OSS as replacement parts.   See In re TFT-LCD (Flat Panel) Antitrust Litig., 586 F. Supp. 2d 1109, 1121 (N.D. Ca. 2008) ("In re Flat Panel") (citing D.R. Ward

Constr. Co. v. Rohm & Haas Co., 470 F. Supp. 2d 485, 491 (E.D. Pa. 2006) (finding standing where "plaintiffs allege that they paid an inflated price for plastics additives due to [the] defendants' price-fixing agreement, thereby implying that the direct harm of the price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives")).  Here, as was the case in In re (Flat Panel), 586 F. Supp. 2d at 1123, IPPs have advanced allegations that the markets are inextricably linked and intertwined. (Doc. No. 67 at ¶ 235; Doc. No. 70 at ¶ 181).

Defendants' price-fixing conspiracy eliminated price competition, kept prices of OSS fixed, raised, maintained, or stabilized at artificially inflated levels; caused IPPs to pay higher prices for components of the cars and passed the overcharges through each level of distribution.  (Doc. No. 55 at ¶ 200).

IPPs have alleged that the market for OSS and the market for cars are inextricably linked and intertwined because the market for OSS exists to serve the vehicle market.  (Doc. No. 55 at ¶ 203; Doc. No. 58 at ¶ 139).  The precise amount of the overcharge impacting the prices of new motor vehicles containing OSS can be measured and quantified. (Doc. No. 55 at ¶ 212).  Consequently, there is a reasonable inference here that Defendants' anticompetitive conduct harmed businesses and impacted the prices that consumers paid for new vehicles.

Likewise, the directness of the injury factor is satisfied here, and the Court rejects Defendants' assertion that the distribution chain is so complex and the factors affecting prices paid by IPPs too numerous to satisfy the pleading requirements.  Because IPPs asserted that "the cost of the component was traceable through the product distribution chain," they have alleged a chain of causation (See Doc. No. 55 at ¶¶ 204-205; Doc.

21

No. 58 at ¶ 140).  Therefore, according to IPPs, they can trace overcharges through the distribution chain, and this AGC factor is satisfied.  In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1155 (N.D. Cal. 2009).

Similarly, the harm alleged becomes less speculative in light of IPPs' assertion that the component parts remain separate and traceable.  In re Flash Memory Antitrust Litig., 643 F. Supp. 2d at 1155 (citation omitted); In re Graphics Processing Units Antitrust Litig., 540 F. Supp. 2d 1085, 1098 (N.D. Calif. Nov. 7, 207) (In re GPU II).  In addition, IPPs advance allegations as to how to measure the harm.  (Doc. No. 55 at ¶¶ 211-212).

Lastly, the Court finds that any difficultly arising out of the apportionment of damages does not sink IPPs' claims due to duplicative recovery.  Here, IPPs have indicated that the alleged overcharges are distinct and traceable.  Other courts have recognized that such allegations lessen the risk of duplicative recovery.  See  In re Flash Memory, 643 F. Supp. 2d at 1156 (citing In re Flat Panel, 586 F. Supp. 2d at 1124; In re GPU II, 540 F.Supp.2d at 1098).

In sum, the Court is satisfied that the AGC factors do not undermine standing. Therefore, the Court declines to dismiss the claims brought under the laws of Arizona, California, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, or Wisconsin on this basis.

In addition, Defendants ask the Court to find antitrust claims brought under the laws of New Hampshire and Utah are barred because the conduct at issue occurred

22

before the Illinois Brick repealer statutes were enacted.  Specifically, Utah enacted its

statute in 2006, and New Hampshire enacted its indirect purchaser statute in 2008.

According to Defendants, the statutes either expressly apply prospectively or the state

courts have refused to apply the statutes retroactively.  The Court previously held that

even if the date of enactment limits damages, it does not preclude any claim alleged

here in its entirety.  Accordingly, the Court finds that Utah Code Ann. § 76-10-918m,

which took effect on May 1, 2006, limits IPPs' antitrust claim to price-fixing that occurred

after the 2006 amendment.  Likewise, N.H. Rev. Stat. Ann. § 356:11 bars recovery for

claims brought under the law of New Hampshire for conduct that occurred prior to

January 1, 2008.

### b.  Sufficiency of the Nexus Between Conduct and Intrastate Commerce

The parties are in agreement that the antitrust statutes of certain jurisdictions

require a plaintiff to allege a nexus between a defendant's conduct and intrastate

commerce; boilerplate allegations are insufficient.  The parties disagree as to whether

the allegations in the complaints satisfy the pleading requirements. Those jurisdictions

at issue include the District of Columbia, Mississippi, Nevada, New York, North

Carolina, South Dakota, Tennessee, and West Virginia.

In general, Defendants challenge the nexus in the IPPs' complaint based upon

EPPs' failure to allege either that they were residents of the identified states and District

of Columbia or that they purchased OSS in those states where they resided.  The Court

rejects Defendants' argument.  Even if EPPs failed to allege that their purchases

occurred in the jurisdictions in which they resided, the Court finds the pleadings create a

23

reasonable inference that the purchases occurred where the individual plaintiffs reside. EPPs' complaint, read in the light most favorable to their claims, warrants the inference even given the length of the alleged conspiracy and the increased burden created in purchasing vehicles in jurisdictions outside of a plaintiff's resident state.  Finally, EPPs allege that they were injured in the states in which they resided by Defendants' conspiratorial conduct because they were forced to pay inflated prices.

ADPs include businesses in each of the identified jurisdictions.  They too allege that they indirectly purchased and received OSS and vehicles containing OSS.  They allege they paid inflated prices.

        For example, EPPs allege that Defendants entered into an unlawful agreement in restraint of trade in the District of Columbia.  They allege that the conspiracy restrained, suppressed, and eliminated price competition relative to OSS because the prices were fixed, thereby depriving "Plaintiffs and members of the Damages Class" of free and open competition.  (Doc. No. 58 at ¶ 203(c)).  They also allege the illegal conduct "substantially affected" commerce in the District.  Id.  ADPs allege the same (Doc. No. 55 at ¶ 20-21), and that one of the plaintiffs is headquartered in, and  purchased and received vehicles and OSS in the District of Columbia, (Doc. No. 55 at ¶ 20-21), and displayed, sold, and advertised in D.C. during the Class Period.  (Id.)   These types of allegations are sufficient to state a claim under the District of Columbia.  See  Sun Dun, Inc. of Washington v. Coca-Cola Co., 740 F. Supp. 381, 397 (D. Md. 1990) (allowing discovery to ascertain whether an interstate link could be established even though none of the defendants, nor the plaintiff were residents or citizens of the District of Columbia).

24

Case law supports the sufficiency of the nexus stated in IPPs' antitrust claim under Mississippi law inasmuch as two Mississippi residents are alleged to have purchased OSS in Mississippi indirectly from one or more Defendant, (Doc. No. 58 at ¶¶ 36-37), and four businesses in Mississippi allege that they purchased and received OSS and vehicles containing OSS at inflated prices, in Mississippi, and displayed, sold, serviced, and advertised their vehicles in Mississippi during the Class Period.  (Doc. No. 55 at ¶¶ 22-23, 86-87, 96-97, 98-99, 261).  IPPs allege that the prices of OSS were raised, fixed, maintained, and stabilized at artificially high levels through Mississippi, and, that the competition for prices of OSS was restrained, suppressed, and eliminated throughout Mississippi.  (Doc. No. 55 at ¶ 261, Doc. No. 58 at ¶ 182).  See In re GPU II, 540 F. Supp. 2d at 1099 (holding that allegations that the defendants' conspiracy affected commerce within Mississippi satisfied requirement that the majority of an antitrust conspiracy occur within the state) (citing Standard Oil Co. of Kentucky v. State, 107 Miss. 377, 65 So. 468, 471 (1914) (the defendants sold and distributed products in Mississippi), overruled in part on other grounds sub nom. Mladinich v. Kohn, 250 Miss. 138, 164 So.2d 785 (1964));  California v. Infineon Techs. AG., 531 F. Supp. 2d 1124, 1158-1159 (N.D. Cal. 2007) (observing that the Mississippi Antitrust Act should be construed to require allegations of at least some activity or conduct occurring in intrastate commerce or trade).

The same factual allegations are advanced by Nevada residents:  they purchased OSS indirectly from one or more of the Defendants, at inflated prices, in Nevada because of Defendants' conspiracy.  (Doc. No. 55 at ¶¶ 63, 263; Doc. No. 58 at ¶¶ 43, 184).  ADPs also allege that they advertised, sold and serviced vehicles in

25

Nevada during the Class Period.  (Id.)  The allegations meet the pleading requirements relative to Nev. Rev. Stat. Ann. § 598A.060(1), which prohibits conduct that is part of a conspiracy in restraint of trade in Nevada.  See In re Flat Panel, 599 F. Supp. 2d at 1189 (finding similar allegations sufficient to state a claim under the Nevada statute).

Defendants next contend that the antitrust claims under New York law fail because EPPs have not alleged a sufficient impact on intrastate commerce.  Again, EPPs allege that Defendants raised and maintained OSS prices throughout New York, depriving IPPs of free and open competition, and causing EPPs to pay artificially inflated prices.  (Doc. No. 58 at ¶¶187(a)-(d), 209(a)-(j)).  The allegations advanced by IPPs differ from those found lacking and insufficient under New York law because IPPs have alleged that they paid artificially high prices in New York.  See H-Quotient, Inc. v. Knight Trading Grp., Inc., 03 CIV. 5889 (DAB), 2005 WL 323750 (S.D.N.Y. Feb. 9, 2005) (the plaintiff included no allegations of intrastate conduct or that New York's local interests were affected by the challenged conduct).

The allegations likewise satisfy South Dakota's antitrust statute, S.D. Codified Laws § 37-1-3.1, which reads: "a contract, combination or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful."  IPPs have alleged they purchased price-fixed products that entered the state.  IPPs allege that plaintiffs reside in South Dakota and purchased OSS.  (Doc. No. 55 at ¶¶ 5,16,18; Doc. No. 58 at ¶ 17).  Independent Purchaser Plaintiffs allege the prices paid were supracompetitive, because they were fixed at artificially high levels throughout the state and had a substantial effect on South Dakota commerce.  (Doc. No. 55 at ¶ 270(a)-(b); Doc. No. 58 at ¶ 191(a)-(b)).  The law does not require that

26

Defendants sell the price-fixed products themselves in South Dakota, and these allegations satisfy the pleading standards. See In re GPU II Antitrust Litig., 540 F. Supp. 2d at 1099.

The Tennessee state court, in Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 516 (Tenn. 2005), found a claim brought under Tennessee Code Annotated § 47-25-101 (2001), must meet the "substantial effects standard."  In contrast to the out-of-state plaintiff in Freeman Indus., who never alleged that it purchased the price-fixed product from a defendant with ties to Tennessee, here, in-state EPPs allege they purchased vehicles containing price-fixed products in Tennessee.  (Doc. No. 58 at ¶¶ 56, 192(a)-(b)).  Accordingly, the Court rejects Collective Defendants' request for dismissal of this claim.

Lastly, the Court finds EPPs have stated a claim under West Virginia antitrust law, which "is directed towards intrastate commerce."  State ex rel. Palumbo v. Graley's Body Shop, Inc., 425 S.E.2d 177, 183 n.11 (W. Va. 1992) (citation omitted).  EPPs have alleged, albeit through inference, the purchase of OSS in West Virginia. (Doc. No. 58 at ¶ 60-62).  IPPs allege an impact on intrastate commerce in that "price competition was restrained, suppressed, and eliminated throughout" the state.  (Doc. No. 58 at ¶ 195(a)).  They further allege that they paid "supracompetitive, artificially inflated prices" that had "a substantial effect on West Virginia commerce."  (Id.)  These allegations, read in the light most favorable to EPPs, demonstrate that once the price-fixed products entered the state's commerce, and were purchased by EPPs, an antitrust injury occurred.

In sum, the Court rejects Defendants' nexus argument.

### c.  Class Action

27

Because Illinois does not allow an indirect purchaser plaintiff to maintain an

antitrust claim as a class action, 740 Ill. Comp. Stat. §10/7(2); In re Digital Music

Antitrust Litig., 812 F. Supp. 2d 390, 415-16 (2011) (dismissing putative class action

under Illinois antitrust law), ADPs' claims must be dismissed.  See Shady Grove

Orthopedic Assoc. v. Allstate Ins. Co., 559 U.S. 393, 130 S.Ct. 1431, 1445 (2010)

(holding that Rule 23 applies in federal court unless it "abridge[s], enlarge[s] or

modif[ies] any substantive right" under the Rules Enabling Act, 28 U.S.C. §2072(b)).

Accord In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 416 (S.D. N.Y. 2011).

Accordingly, the Court dismisses ADPs' antitrust claim under Illinois law.

### 2.  Consumer Protection Claims

In their consumer protection claims, IPPs seek relief under the laws of Arkansas,

California, Florida, District of Columbia, Florida, Hawaii, Missouri, New Mexico, New

York, North Carolina, Rhode Island, South Carolina and Vermont.  Defendants raise

several arguments in support of dismissal, including failure to meet particular pleadings

standards, failure to allege a sufficient nexus between conduct and commerce, failure to

meet the definition of consumer, and state bars against class actions.

### a.  Special Pleading Requirements

Defendants challenge IPPs' claims under the consumer protection statutes of

Arkansas, Florida, New Mexico, New York, and Rhode Island based on their position

that the claims fail to include special pleading requirements.  The Court addressed

these arguments in prior component part cases, has reviewed the authority cited by the

parties, and finds no grounds for altering its prior analysis.

Under Arkansas law, the the Arkansas Deceptive Trade Practices Act ("ADTPA"),

28

Ark. Stat. Ann. § 4-88-107(a) (10), is construed liberally.  Curtis Lumber Co. v. La.

Pacific Corp., 618 F.3d 762, 780 (8th Cir. 2010).  See also In re Flash Memory Antitrust

Litig., 643 F. Supp. 2d 1133, 1156-57 (N.D. Cal. 2009).  Although Defendants contend

that price-fixing claims are not allowed under the ADTPA, many courts have allowed

such claims under the Act.  In re Aftermarket Filters Antitrust Litig., 08 C 4883, 2009 WL

3754041 (N.D. Ill. Nov. 5, 2009); In re: Chocolate, 602 F. Supp. 2d at 583 (N.D. Pa.

2009) (and cases cited therein). Accordingly, Defendants' motion to dismiss claims

brought pursuant to the ADTPA is denied.

        Next, Defendants conclude that the consumer protection claims under Florida

law fail to meet Rule 9(b)'s requirement that a plaintiff allege "with particularity the

circumstances constituting fraud or mistake."  See Fed. R. Civ. P. 9(b).  The Court

addressed and rejected this argument in the wire harness cases, relying on Galstaldi v.

Sunvest Communities USA, LLC, 637 F. Supp. 2d 1045, 1058 (S.D. Fla. 2009), a case

in which the federal district court rejected the notion that Rule 9(b) applies to FDUTPA

claims.  The court observed that "FDUTPA was enacted to provide remedies for

conduct outside the reach of traditional common law torts such as fraud, and therefore,

'the plaintiff need not prove the elements of fraud to sustain an action under the

statute.'"  Id. at 1058 (citations omitted).  In Galstaldi, the court concluded that Rule 9(b)

does not apply to FDUTPA claims; thus, its requirements cannot serve as a basis to

dismiss those claims.  Therefore, the claim here, which is based on price-fixing

conspiratorial conduct, is not subject to dismissal based on Rule 9(b).

        To support their claim under New Mexico's Unfair Practices Act, N.M. Rev. Stat.

§ 57-12-2, IPPs allege that the conspiracy resulted in artificially inflated price levels of

OSS, leading to a "gross disparity" between the value received by the New Mexico plaintiff and class and the prices paid for the OSS. (Doc. No. 55 at ¶ 285(c)); Doc. No. 58 at ¶ 208(c)).  In addition, ADPs allege that they lacked the power to negotiate the price.  (Doc. No. 55 at ¶ 285(b)).  The allegations differ from those found lacking in GPU II, 527 F. Supp. 2d at 1029-30 (finding that unconscionability requires something more than merely alleging that the price of a product was unfairly high" and dismissing price-fixing claim).  See In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 586 (M.D. Pa. 2009); In re New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d 160, 196 (D. Maine 2004).  Accordingly, the allegations conform to the pleading requirements of Rule 12(b)(6).

This Court also rejects Defendants' contention that because IPPs included no allegation that they were aware of a defendant's deceptive acts, their claim is defective under New York law.  In the case before this Court, the anticompetitive conduct is "imbued with a degree of subterfuge," which is sufficient to sustain a claim under New York law.  See Leider v. Ralfe, 387 F. Supp. 2d 283, 296 (S.D.N.Y. 2005) (rejecting a § 349 claim where the defendant's conduct was not secretive) (citations omitted).  Specifically, IPPs have alleged that Defendants engaged in materially deceptive conduct because they have alleged Defendants took measures to conceal their price-fixing activities. (Doc. No. 67 at ¶¶ 252-56, 296, 316; Doc. No. 70 at ¶¶ 190-93, 227, 251).  Consequently, the § 349 claim is viable.  See In re Dynamic Random Access Memory (DRAM) Antitrust Litig., 536 F. Supp. 2d 1129, 1143-44 (N.D. Cal. 2008); In re GPU II, 527 F. Supp. 2d at 1030.

Lastly, Defendants challenge EPPs' price-fixing claim under The Rhode Island

30

Unfair Trade Practice and Consumer Protection Act ("RIUTPCPA"), which prohibits

"[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct

of any trade or commerce."  R.I. Gen. Laws § 6-13.1-2.  This Court reviewed the statute

in the wire harness component part case and held that price-fixing injuries fall within the

scope of the statute.  The Court finds no basis for altering its determination.  See  In re

Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 586 (M.D. Pa. 2009)

(citing In re Flat Panel, 586 F. Supp. 2d at 1129-30; In re (DRAM II), 536 F. Supp. 2d at

1144-45 (observing that price fixing is "likely to offend public policy[,]" as reflected by

statutes proscribing anticompetitive activity).  Therefore, the EPPs' claim under the

consumer protection act of Rhode Island survives.

### b.  Nexus between Conduct and Intrastate Commerce

Defendants challenge claims under the consumer protection laws of California,

Montana, New York, and North Carolina because the complaints lack allegations that

any of the offending conduct took place within the state or had an effect on intrastate

commerce in these states.

Defendants' argument as to the viability of the consumer protection claim under

California law rests on their position that EPPs do not allege any of the challenged

conduct took place in the particular state.  The Court addressed the same argument in

prior component part cases and concluded that IPPs had satisfied their pleading

obligations, distinguishing Meridian Project Sys. Inc. v. Hardin Constr. Co., 404 F. Supp.

2d 1214, 1225 (E.D. Cal. 2005), because the plaintiff in that case explicitly alleged that

the misconduct occurred in Illinois, not California.  Under case law from California,

"claims by nonCalifornia residents where none of the alleged misconduct or injuries

31

occurred in California" do not state a claim.  See Norwest Mortgage, Inc. v. Superior Court, 85 Cal.Rptr.2d 18 (Cal Ct. App. 1999).  Here, EPPs allege that two California residents purchased OSS indirectly from one or more Defendants at artificially inflated prices.  (Doc. No. 58 at ¶¶ 24-25, 161, 202(i), 174(d)(1),(2)).  The Court finds these allegations are sufficient.

Defendants advance the same challenge to EPPs' claim under Montana's Unfair Trade Practices Act ("MUTPA"), Mont. Code Ann. § 30-14--101 et seq.  This Court previously rejected the same argument because EPPs alleged that price competition was restrained in Montana.  (Doc. No. 58 at ¶ 207(a)).  EPPs have alleged that Defendants' conduct was directed at the automotive parts market in all states, including Montana; that the conduct had the reasonably foreseeable effect of raising the price for finished products in all states, including Montana, and EPPs purchased price-fixed products in Montana, paying supracompetitive prices for those products.  (Id.)

As for the sufficiency of the nexus relative to the New York claim, the Court again finds the pleadings are sufficient.  Under New York General Business Law § 349 (1984), commercial misconduct occurring within New York is prohibited. To prevail on a claim under § 349, "a plaintiff must establish three elements: the challenged act or practice was consumer-oriented; it was misleading in a material way; and the plaintiff suffered injury as a result of the deceptive act."  In re Flat Panel, 586 F. Supp. 2d at 1127.  The shortcomings raised by Defendants with regard to EPPs' New York consumer protection claim have been addressed by this Court in prior component part cases.  EPPs include three New York residents, and, as the Court previously stated, the allegations, read in the light most favorable to EPPs, suggests that the purchases took place in New York.

32

EPPs allege Defendants engaged in deceptive commercial misconduct regarding the "prices at which OSS were sold, distributed or obtained in New York."  (Doc. No. 58 at ¶ 209(a)). The allegations describe conduct occurring in New York, and the claim survives.

The North Carolina Unfair Trade Practices Act ("NCUTPA"), N.C. Gen. Stat. § 75-1.1, contains broad-sweeping language that declares unlawful, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."  Under the statute, a "conspiracy in restraint of trade or commerce in the state of North Carolina is hereby declared to be illegal." Id.   To bring a claim under the North Carolina Unfair Trade Practices Act ("NCUTPA"), a plaintiff must allege that the defendants' conduct had a substantial effect on in-state business. Merk & Co. v. Lyon, 941 F. Supp. 1443, 1463 (M.D. N.C. 1996).   Accord, Duke Energy Int'l, LLC v. Napoli, 748 F. Supp. 2d 656, 677 (S.D. Tex. 2010) (holding that "[a] plaintiff who does not allege a substantial effect on in-state North Carolina operations fails to state a claim under the NCUTPA").  Defendants argue that no claim is stated because the IPPs' complaints address nationwide effects that impact North Carolina no more than any other state.  The Court disagrees.  IPPs allege that North Carolina IPPs were harmed by paying supracompetitive, artificially inflated prices" for OSS.  (Doc. No. 55 at ¶¶ 58-59, 267(a)-(b); Doc. No. 58 at ¶ 210(c)).  These allegations demonstrate that the application of North Carolina law is "neither arbitrary or unfair." Duke Energy, 748 F. Supp. 2d at 677.  Therefore, the Court denies Defendants' request for dismissal on this basis. Accord In re Flonase Antitrust Litig., ("In re Flonase II") 692 F. Supp. 2d 524, 540-41 (E.D. Pa. 2010) (considering whether allegations that large amounts of product

33

sold in North Carolina at artificially inflated prices satisfied the substantial in-state effect required by the statute).

In sum, the Court denies Defendants' request for dismissal of the consumer protection claims on the sufficiency of the nexus between Defendants' conduct and intrastate commerce.  These allegations satisfy the pleading burden.

### c. Availability of Protection of Businesses

ADPs do not oppose dismissal of their consumer protection claim under D.C. law, which does not protect "merchants in their commercial dealings with suppliers or other merchants."  Ford v. ChartOne, Inc., 908 A.2d 72, 83-84 (D.C. 2006) (observing that the District of Columbia Consumer Protection Procedures Act polices conduct arising out of a consumer-merchant dispute).   Accord Dist. Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 717 (D.C. 2003).  Accordingly, it is dismissed.

### d. Class Action Bar

Defendants assert that Auto Dealer Plaintiffs are barred from bringing their consumer protection claims under South Carolina law because it prohibits class actions. See South Carolina Unfair Trade Practices Act (SCUTPA"), S.C. Code § 39-5-140(a). The Court was persuaded in prior component part cases that Defendants are correct. See Stalvey v. American Bank Holdings, Inc., No. 4:13-cv-714, 2013 WL 6019320 at *4 (D. S.C., Nov. 13, 2013) (distinguishing Shady Grove and holding that the text of the SCUTPA that prohibits class actions, is part of the "substantive portions of South Carolina law and [is] not trumped by Federal Rule of Civil Procedure 23, even in light of the Shady Grove decision").  See also In re MI Windows and Doors, Inc. Products Liability Litig., No. 2:11–cv–00167–DCN, 2012 WL 5408563 (D. S.C. Nov. 6, 2012).

34

Therefore, Defendants request to dismiss the claim is granted.

Defendants additionally argue that EPPs cannot maintain their consumer protection claims as a class action under Montana law.  In <u>Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.</u>, 559 U.S. 393 (2010), the Supreme Court held that Rule 23 applies in federal court unless it "abridge[s], enlarge[s] or modif[ies] any substantive right" under the Rules Enabling Act, 28 U.S.C. § 2072(b).  A federal rule "cannot govern a particular case in which the rule would displace a state right or remedy that is procedural in the ordinary sense of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right."  <u>Id.</u>  As the Court held previously, the prohibition does not alter the substantive scope of the right to relief, and in the absence of governing authority to the contrary, the Court declines to dismiss on this ground.

### 3.  Unjust Enrichment Claims

Defendants challenge IPPs' unjust enrichment claims on four grounds. According to Defendants, the state unjust enrichment claims must be dismissed because Defendants gave consideration, because IPPs did not confer a benefit directly on Defendants, because IPPs voluntarily entered into purchasing arrangements for OSS or vehicles containing OSS and received the benefit of their bargains, and because IPPs failed to meet special pleading requirements in certain states.

Before turning its attention to the specific arguments, the Court recognizes that although the particular elements of unjust enrichment vary from jurisdiction to jurisdiction, when stripped to its essence, a claim of unjust enrichment requires IPPs to

allege sufficient facts to show that Defendants received a benefit, and under the circumstances of the case, retention of the benefit would be unjust.  See In re Flonase II, 692 F. Supp. 2d at 54 (holding that a claim of unjust enrichment requires a plaintiff to plead two elements: "receipt of a benefit and unjust retention of the benefit at the expense of another").  In support of their unjust enrichment claims, IPPs allege that as a result of the challenged conduct, "Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits" from the sales of OSS that "Defendants have benefitted from their unlawful acts," and that "it would be inequitable for Defendants to be permitted to retain any of the 'ill-gotten gains' resulting from the overpayments."  (Doc. No. 55 at ¶¶ 292-93, 215; Doc. No. 58 at ¶¶ 214-15, 293).

Although the Court agrees that these particular allegations are conclusory, the Court does not read these allegations in isolation, but in light of all of the factual allegations in the complaints.  An unjust enrichment claim is used to prevent a defendant from "profit[ing] by his own wrong."  Restatement (Third) of Restitution & Unjust Enrichment § 3.  Here, IPPs allege that Defendants profited from their antitrust conspiracy.  The Court has addressed the arguments advanced here in other component part cases and, after reviewing the cases, finds no basis for altering its analysis.  Therefore, the Court dismisses IPPs' claim of unjust enrichment under California law, as it does not recognize a cause of action for unjust enrichment.  See Hill v. Roll Int'l Corp., 195 Cal. App. 4th 1295, 1307, 128 Cal. Rptr. 3d 109 (2011); Levine v. Blue Shield of Cal., 189 Cal. App. 4th 1117, 1138, 117 Cal. Rptr. 3d 262 (2010).  Accord Fraley v. Facebook, 830 F. Supp. 2d 785, 814 (N.D. Cal. 2011).  For the reasons that

36

follow, the Court declines to dismiss any of the other unjust enrichment claims.

### a. Consideration

Defendants argue that their retention of the payment is not unjust given the consideration they have provided.  There is no dispute that Defendants gave OSS to their direct customers.  Nevertheless, the Court disagrees with Defendants that the exchange of OSS for payment bars IPPs' unjust enrichment claims.  The issue is whether the transaction was unjust.  IPPs allege that they overpaid for OSS because Defendants fixed the prices of OSS.  The facts alleged in their complaints meet their pleading burden, see In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 545 (D.N.J. 2004) (the exchange of "any consideration" does not bar recovery under an unjust enrichment theory), inasmuch as the allegations create an inference that the consideration was not reasonable, valuable, or adequate.  Defendants have failed to cite a single case finding that payment or receipt of anything of value from a defendant will defeat a plaintiff's claims for unjust enrichment.  "Determinations that depend on evaluating whether a benefit received approximates the value paid are primarily questions of fact, and as such, are not appropriately addressed on a motion to dismiss." Id. at 546.

Moreover, the Court finds the cases upon which Defendants' rely are not persuasive for either of two reasons.  First, they address consideration in the context of general contractor/subcontractor relationships and cannot be read to cover the price-fixing claims advanced here.  Accordingly, the Court rejects the request for dismissal of all the unjust enrichment claims of Florida, Kansas, Massachusetts, Missouri, Nevada,

37

New Hampshire, South Dakota,[3] Tennessee, Utah, Vermont, and Wisconsin on the
ground that Defendants gave consideration.  See e.g. Tradesmen Int'l, Inc. v. United
States Postal Serv., 234 F. Supp. 2d 1191, 1205 (D. Kan. 2002) (principles preventing a
subcontractor from recovering against a property owner in unjust enrichment are equally
applicable to a sub-subcontractor's claim of unjust enrichment against the general
contractor); County Asphalt Paving Co., Inc. v. Mosley Const., Inc., 239 S.W.3d 704
(Mo. Ct. App. 2007) (holding that an owner cannot be unjustly enriched by retaining the
benefits of work performed by subcontractors where the owner has paid the general
contractor in full); Browyer v. Davidson, 584 P.2d 686, 687 (Nev. 1978) (subcontractor's
failure to enforce his lien rights precluded his claim that the defendant was unjustly
enriched by the benefits retained); Mangiardi Bros. Trucking, Inc. v. Dewey Envtl., LLC,
12-CV-481-JD, 2013 WL 1856338 (D. N.H. Apr. 30, 2013) (observing that although it is
unfair that contractors were not fully compensated for their services, it is equally unfair
that a party which did not receive a benefit should have to pick up the slack); Paschall's,
Inc. v. Dozier, 407 S.W.2d 150 (Tenn. 1966) (action against homeowners for materials
and labor furnished in construction of bathroom addition to house); Concrete Prods.
Co., a Div. of Gibbons & Reed v. Salt Lake Cnty., 734 P.2d 910, 911 (Utah 1987)
(holding that the defendant county had not been unjustly enriched by the plaintiff's
delivery of concrete for curbs and gutters to a third-party who never paid); Ray Reilly's
Tire Mart, Inc. v. F.P. Elnicki, Inc., 537 A.2d 994, 995 (Vt. 1987) (citing Morrisville

---

[3]Although Defendants maintain that IPPs agreed to dismiss this their unjust
enrichment claim under South Dakota law because they did include a specific response,
IPPs did advance general arguments against Defendants' position that consideration by
Defendants undermines the claim.

Lumber Co., Inc. v. Okcuoglu, 531 A.2d 887, 889 (Vt. 1987) (holding that "retention of a benefit is not unjust" where owner did not accept material or deal directly with the subcontractor)); Tri-State Mech., Inc. v. Northland Coll., 681 N.W.2d 302, 305-06 (Wisc. Ct. App. 2004) (observing that the plaintiff could not recover under a theory of unjust enrichment where an unpaid subcontractor brought claim against the owner that has received the benefits, but has already paid for the benefits conferred).

Second, the unjust enrichment claims that failed in the cases upon which Defendants' rely are factually inapposite. Because the essence of an unjust enrichment case turns on the facts, the Court cannot extend the facts of a claim turning on the terms of a contract or the liability of a principal for its agent to the price-fixing claims advanced here. See Ferola v. Allstate Life Ins. Co., 050996, 2007 WL 2705534 (Mass. Super. Aug. 30, 2007) (executor cannot recover because decedent purchased annuity and received benefits under the contract); Parker v. West Dakota Insurers, Inc., 605 N.W. 2d 181, 187 (S.D. 2000) (rejecting former employee's unjust enrichment claim to collect post-employment renewal commissions from her employer--a contractually based argument for unjust enrichment); American Movie Classics v. Rainbow Media Holdings, 508 F. App'x 826 (10th Cir. 2013) (rejecting an unjust enrichment claim under Utah law against the principal where agent was paid in full). Accordingly, the Court denies Defendants' request to dismiss the unjust enrichment claims on the basis of consideration.

### b.  Direct Benefit

In the alternative, Defendants assert that IPPs' claims under Arizona, Florida, Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, North Dakota, Rhode

39

Island, South Carolina, Utah, and the District of Columbia fail because a plaintiff must allege that it directly conferred some advantage on the defendant.  In re Aftermarket Filters Antitrust Litig., No. 08 C 4883, 2010 WL 1416259 at *2-3 (N.D. Ill. Apr. 1, 2010). Here, as indirect purchasers, any benefit conferred by the IPPs was to others in the chain of distribution, not Defendants, and the parties dispute whether the lack of direct contact dooms the unjust enrichment claims.  The Court holds that it does not.

The "critical inquiry [i]s not whether the benefit is conferred directly on the defendant, but whether the plaintiff can establish the relationship between his detriment and the defendant's benefit 'flow from the challenged conduct."  In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000) (Edmunds, J.).  See e.g. Yee v. Nat'l Gypsum Co., CV-09-8189-PHX-DGC, 2010 WL 2572976 (D. Ariz. June 22, 2010) (involving a proposed class action arising out of the manufacture and sale of allegedly defective drywall, wherein the plaintiff alleged only that he paid the purchase price for the drywall, and not that he conferred a benefit on the manufacturer); In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 843 (S.D. Ohio 2012) (dismissing an unjust enrichment claim arising out of a Florida plaintiff's purchase of a vehicle containing  defective coolant tubes because there was no direct link to the manufacturer); In re Processed Eggs, 851 F. Supp. 2d at 929 (Florida courts require "some benefit" to flow to the defendant, it finds no requirement that the benefit be bestowed through direct contact); Romano v. Motorola, Inc., No. 07-CIV-60517, 2007 WL 4199781 at *2 (S.D. Fla. Nov. 26, 2007) (refusing to dismiss a claim of unjust enrichment even though the plaintiff purchased a product through a manufacturer's "retail outfit" because the defendant still directly benefitted through profits arising out of

40

the sale); <u>Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline,</u>

<u>PLC</u>, 737 F. Supp. 2d 380, 434 (E.D. Pa. 2010) (rejecting claim that the antitrust injury

suffered by Iowa plaintiffs was too remote); <u>Commercial Fed. Bank v. Qwest Corp.</u>, 695

N.W.2d 41 (Iowa Ct. App. 2004) (subcontractors seeking unjust enrichment claim

against owner); <u>In re Processed Eggs</u>, 851 F. Supp. 2d at 929-930 (no requirement

under Kansas law that the benefit flow directly from the plaintiff to the defendants, and

acknowledging that courts have upheld unjust enrichment claims brought by indirect

purchasers of price-fixed parts); <u>In re Static Random Access Memory (SRAM) Antitrust</u>

<u>Litig.</u>, 07-MD-01819 CW, 2010 WL 5094289 at *7 (N.D. Cal. Dec. 8, 2010) (Michigan

law does not require a benefit to be conferred directly by plaintiff to a defendant) (citing

<u>Kammer Asphalt Paving Co., Inc. v. East China Township Schools</u>, 443 Mich. 176, 187-

88, 504 N.W.2d 635 (1993); <u>Morris Pumps v. Centerline Piping, Inc.</u>, 729 N.W.2d 898

(Mich. Ct. App. 2006); <u>In re Cardizem CD Antitrust Litig.</u>, 105 F. Supp. 2d 618, 670-71

(E.D. Mich. 2008)); <u>Schumacher v. Schumacher</u>, 627 N.W.2d 725, 729 (Minn. Ct. App.

2001) (remanding dismissal of claim for unjust enrichment for consideration of whether

the defendants benefitted by illegal or unlawful conduct); <u>Sperry v. Crompton Corp.</u>, 26

A.D.3d 488, 810 N.Y.S.2d 498, 499-500 (N.Y. App. Div. 2006) (affirming the dismissal

of an unjust enrichment claim brought by New York indirect purchasers because the

alleged connection between plaintiffs and defendants was simply too attenuated, but

observing "a plaintiff need not be in privity with the defendant to state a claim for unjust

enrichment"); <u>Baker Constr. Co. v. City of Burlington</u>, No. COA09-13, 2009 WL

3350747, at *1 (N.C.App. Oct. 20, 2009) (rejecting a claim by the plaintiff construction

company against the subsequent owner of the property, noting that "[w]here a third

41

person benefits from a contract entered into between two other persons[,] the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person"); Opp v. Matzke, 559 N.W.2d 837, 839-40 (N.D. 1997) (no direct benefit requirement); In re TFT-LCD (Flat Panel) Antitrust Litig., M 07-1827 SI, 2011 WL 4501223 (N.D. Cal. Sept. 28, 2011) (declining to dismiss unjust enrichment claim under Rhode Island law on the defendant's direct benefit argument); Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 341 S.C. 1, 3, 532 S.E.2d 868, 869, 873 (2000) (rejecting unjust enrichment claim where benefit to defendant was "incidental"); Rawlings v. Rawlings, 240 P.3d 754, 761 (Utah 2010) (recognizing the flexible nature of the claim); In re Processed Eggs, 851 F. Supp. 2d at 934 (no requirement of direct benefit to defendant under Utah law); Minebeaq Co. Ltd. v. Pabst, 444 F. Supp. 2d 168, 186 (D.C. 2006) (involving payment for a patent by joint venture partner); In re (Flat Panel), 2011 WL 4501223 at *12 (rejecting argument that "the District of Columbia requires a 'direct relationship' between an unjust enrichment plaintiff and the defendant").

### c. Benefit of the Bargain

Defendants also assert that IPPs' unjust enrichment claims fail because IPPs entered into a voluntary agreement and received the benefit of their respective bargains.   Defendants challenge claims brought under the laws of Arizona, Arkansas, District of Columbia, Florida, Illinois, Iowa, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, and Utah as subject to dismissal on this ground.

42

The Court has reviewed the case law cited by Defendants and finds that the authority does not support dismissal of a price-fixing claim on this basis–the cases do not stand for the proposition that a plaintiff must allege that he dealt directly with the defendants. Specifically, IPPs had no contractual relationship with Defendants, a fact that distinguishes IPPs' unjust enrichment claims from the cases cited by Defendants. See e.g. USLife Title Co. of Ariz. v. Gutkin, 732 P.2d 579, 585 (Ariz. Ct. App. 1986) (rejecting the plaintiff's unjust enrichment claim where the plaintiff had already received the quitclaim deed for which it had bargained); Frein v. Windsor Weeping Mary LP, 366 S.W.3d 367, 372 (Ark. Cr. App. 2009) (observing that "the concept of unjust enrichment has no application when an express written contract exists"); Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1076 (D.C. 2008) (dismissing an unjust enrichment claim because it advanced the same theory behind a breach of contract claim); Prohias v. Pfizer, Inc., 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007) (rejecting the plaintiffs' unjust enrichment claim involving deceptive advertising of a drug because the plaintiffs continued to pay for the drug even after they had "knowledge as to its alleged limitations," thus they were not "actually injured or aggrieved by the allegedly misleading advertisement"); La Throp v. Bell Fed. Sav. & Loan Ass'n, 370 N.E.2d 188, 195 (Ill. 1977) (rejecting the plaintiffs' unjust enrichment claim that the defendant should pay interest on impoundment funds, observing that "the absence of a provision to pay interest on the impoundment funds is equivalent to an agreement that it should not be paid"); Smith v. Stowell, 125 N.W.2d 795, 800 (Iowa 1964) (express written agreement covered the subject matter of the dispute); Ferola v. Allstate Life Ins. Co., 050996, 2007 WL 2705534 (Mass. Super. Aug. 30, 2007) (when claim arises in

43

"the context of a contract, in order for defendant's retention of money received to be

unfair, the plaintiff must allege that consideration failed"); Isom v. NE Lots LLC, No.

288378 (Mich. Ct. App. Jan. 14, 2010) (a party cannot use unjust enrichment to alter the

terms of a contract); Zinter v. Univ. of Minnesota, 799 N.W.2d 243, 247 (Minn. Ct. App.

2011) (no claim where  contract covered the parties' relationship); Am. Standard Ins.

Co. of Wisconsin v. Bracht, 103 S.W.3d 281, 293 (Mo. App. S.D. 2003) (when an

express contract governs the subject matter, a claim of unjust enrichment does not

apply); Farmers New World Life Ins. Co. v. Jolley, 747 S.W.2d 704, 707-08 (Mo. App.

W.D. 1988) (holding that plaintiff's entering into an agreement with known risks

precluded recovery under an unjust enrichment claim when an anticipated contingency

occurred); Washa v. Miller, 546 N.W.2d 814, 819 (Neb. 1996) ("unjust enrichment is

recognized only in the absence of an agreement between the parties"); Clapp v.

Goffstown Sch. Dist., 977 A.2d 1021, 1025 (N.H. 2009) (citing 42 C.J.S. Implied

Contracts § 38 (2007) (noting that "unjust enrichment. . .is not a means for shifting the

risk one has assumed under contract"); Arena Res., Inc. v. Obo, Inc., 238 P.3d 357, 361

(N.M. Ct. App. 2010) (rejecting unjust enrichment claim, noting that, in general, a

contract had to be enforced as written absent "fraud, real hardship, oppression, mistake,

unconscionable results, and the other grounds of righteousness, justice and morality");

Vitale v. Steinberg, 307 A.D.2d 107, 111, 764 N.Y.S.2d 236 (2003) (in New York, the

state courts reject claims for unjust enrichment when express contracts govern the

same subject matter); Britt v. Britt, 359 S.E.2d 467, 470 (N.C. 1987) (the parties'

agreement governs whether a defendant was unjustly enriched); Jerry Harmon Motors,

Inc. v. Heth, 316 N.W.2d 324, 328 (N.D. 1982) ("a person is not unjustly enriched by

44

retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution") (citation omitted); High v. Davis, 584 P.2d 725, 736 (Or. 1978) (observing that a quitclaim deed establishes the parties' agreement in a property transaction, and the purchaser assumes the risk of defective title); Doe v. Burkland, 808 A.2d 1090, 1095 (R.I. 2002) (reinstating unjust enrichment counterclaim as well as others dismissed by the lower court because it ignored the allegation that valid consideration provided for the property-sharing agreement) (citing Rhode Island Hosp. Trust Co. v. The Rhode Island Covering Co., 190 A.2d 219 (R.I. 1963)); Johnston v. Brown, 357 S.E. 2d 450, 452 (S.C. 1987) (reversing dismissal of unjust enrichment claim in light of evidence of lack of an agreement); S. Title Guar. Co., Inc. v. Bethers, 761 P.2d 951, 955 (Utah Ct. App. 1988) (citation omitted) (when a plaintiff enters into a "transaction at arm's length and the plaintiff received what he bargained for" he cannot bring a claim for unjust enrichment).

The Court finds the case law is not applicable to the facts before it. In contrast to the relationships involved in the case law cited by Defendants, here the parties were not in a direct bargaining relationship. Instead, IPPs' unjust enrichment claims arise out of the alleged antitrust violations that resulted in payment of overcharges by IPPs. Further, IPPs allege that they had no knowledge of the antitrust conspiracy, they were not in a contractual relationship with Defendants, and, consequently, the Court denies Defendants' request for dismissal.

### d. Special Pleading Requirements

Lastly, Defendants argue that Arizona, Florida, Hawaii, Illinois, Massachusetts, Minnesota, Mississippi, North Dakota, South Carolina, Tennessee, Utah, and West

Virginia have special pleading requirements that render the complaints inadequate.

According to Defendants, certain states require a plaintiff bringing an unjust enrichment claim to plead the absence of a legal remedy, or exhaustion of legal remedies, or, in some states, a duty or a mistake of fact.  None of the cases cited by Defendants to support their position is persuasive because the cases can be distinguished factually or by procedural stage in which the decision was rendered.  See e.g. In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 412 (S.D.N.Y. 2011) (citing In re Flonase II, 692 F. Supp. 2d at 543 (denying a motion to dismiss an unjust enrichment claim under Arizona law because the plaintiffs could plead alternative remedies at the pleading stage)); In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig., 955 F. Supp. 2d 1311, 1337 (S.D. Fla. 2013) ("although most equitable remedies are not available under Florida law when adequate legal remedies exist, the rule does not apply to claims of unjust enrichment"); Porter v. Hu, 169 P.3d 994, 1007 (Haw. Ct. App. 2007) (appeal of a jury verdict, not a decision about the sufficiency of the pleadings); Davis v. Four Seasons Hotel Ltd., CIV. 08-00525 HG-BMK, 2011 WL 5025521 (D. Haw. Oct. 20, 2011) (same); Martis v. Grinnell Mut. Reinsurance Co., 905 N.E.2d 920, 928 (Ill. Ct. App. 2009) (observing that "[w]hen an underlying claim of fraud, duress or undue influence is deficient, a claim for unjust enrichment should also be dismissed"); Fernandes v. Havkin, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) (assessing merits of summary judgment of an unjust enrichment claim arising out of a mortgage contract and acknowledging other decisions on summary judgment holding that the "mere availability" of an adequate remedy at law is a bar to a claim of unjust enrichment"); Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.,

46

493 N.W.2d 137, 140 (Minn. Ct. App. 1992) (involving appeal of direct verdict in favor of

defendants because plaintiffs failed to pursue their legal remedy under the mechanic's

lien statute); Willis v. Rehab Solutions, PLLC, 82 So. 3d 583, 588 (Miss. 2012)

(appealing a jury verdict, arguing that unjust enrichment was not the proper measure of

damages); Apache Corp. v. MDU Res. Grp., Inc., 603 N.W.2d 891, 895-96 (N.D. 1999)

(assessing the merits of an unjust enrichment claim relative to a third-party beneficiary's

entitlement to enforce the defendant's contract after the defendant breached its

contract, and concluding that the plaintiff's impoverishment resulted from a valid

contractual arrangement so the result was not contrary to equity); Ellis v. Smith Grading

& Paving, Inc., 294 S.C. 470, 366 S.E.2d 12, 15 (S.C. Ct. App.1988) (outlining elements

of claim, with no reference to a requirement to allege the existence of a duty); Freement

Indus. LLC v. Eastman Chem Co., 172 S.W.3d 512, 526 (Tenn. 2005) ("a plaintiff is not

required to exhaust all remedies against the party with whom the plaintiff is in privity if

the pursuit of the remedies would be futile"); In re (Flat Panel) Antitrust Litig., 599 F.

Supp. 2d at 1192-93 (denying the futility exception in a case involving Tennessee

indirect purchasers, advancing a price-fixing claim against the defendant-

manufacturers, where there were no allegations that resellers were involved in the

conspiracy because futility was "self-evident"); Nickerson Co. v. Energy W. Mining Co.,

No. 20090221-CA- 2009 WL 4681778 at *2 (Utah Ct. App. Dec. 10, 2009) (addressing

summary judgment argument that "one must first exhaust his legal remedies before he

may recover on the basis of the equitable doctrine of quantum meruit"); Wittenberg v.

First Indep. Mortg. Co., No. 3:10-CV-58, 2011 WL 1357483 at *15 (N.D. W.Va. Apr. 11,

2011) (dismissing the plaintiff's unjust enrichment claim because the conduct at

47

issue–the securitization of the plaintiff's loan–was neither unlawful nor unauthorized).

In sum, the Court has reviewed the case law upon which Defendants' rely and in large measure finds it distinguishable.  For the most part, the state cases cited by Defendants did not involve indirect purchasers of price-fixed products.  IPPs have alleged a lengthy conspiracy by Defendants to fix the prices of IPCs.  The allegations, viewed in the light most favorable to IPPs, satisfy their burden to advance claims of unjust enrichment.  With the exception of California, which does not recognize a claim of unjust enrichment, the allegations in the complaints before the Court create a reasonable inference of unjustness regardless of the particularities of any state law.

### E.  Injunctive Relief

Indirect Purchaser Plaintiffs ask the Court to permanently enjoin Defendants from the violations alleged in their complaints.  (Doc. No. 55, Prayer for Relief at ¶ E; Doc. No. 58, Prayer for Relief at ¶ E).  The request is authorized under the Clayton Act, which provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26.

In challenging the request, Defendants argue that the complaints lack the factual support necessary to establish a real or immediate threat of future harm.  Specifically, Defendants contend that the relief is undermined by the guilty pleas and the widespread publicity.

The Court finds the allegations in the respective complaints are sufficient, at this stage of the proceedings, to satisfy IPPs' burden to allege the existence of "some

cognizable danger of recurrent violation." <u>United States v. W. T. Grant Co.</u>, 345 U.S. 629, 633 (1953). The purpose of an injunction is to prevent future violations. <u>Swift & Co. v. United States</u>, 276 U.S. 311, 326 (1928). Speculation by Defendants that the orders, pleas, and publicity will prevent further misconduct fails to demonstrate the threat of future injury is implausible, particularly in light of the length of the conspiracy alleged and the market conditions. This Court is not in a position to render an assessment that injunctive relief cannot be had at this stage of the proceedings. Accordingly, Defendants' request is denied.

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** in part and **DENIES** in part Defendants' motion. ADPs' antitrust claims under Illinois law are **DISMISSED**. EPPs' antitrust claims under Massachusetts law are **DISMISSED**. The applicable statutes of limitation limit damages under the laws of Utah and New Hampshire. ADPs' South Carolina consumer protection class action is **BARRED,** ADPs' consumer protection claims under the District of Columbia is **DISMISSED**. IPPs' unjust enrichment claim under California law is **DISMISSED**.

**IT IS SO ORDERED.**

Date:   September 25, 2014                          s/Marianne O. Battani
                                                    MARIANNE O. BATTANI
                                                    United States District Judge


<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 25, 2014.

_s/ Kay Doaks_
Case Manager