# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : : | Master File No. 12-md-02311 |
|  | : | H: 12-cv-00603-MOB-MKM |
| PRODUCT(S): OCCUPANT SAFETY RESTRAINT SYSTEMS | : : : : : : | THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| This Document Relates to: ALL END-PAYOR ACTIONS | : : : : : | JURY TRIAL DEMANDED |

Plaintiffs Kimberly Bennett, Rebecca Lynn Morrow, Erica J. Shoaf, Tom Halverson, Sophie O'Keefe-Zelman, Melissa Barron, Meetesh Shah, Elizabeth Kaufmann, Keith Uehara, Jennifer Chase, Darrel Senior, James E. Marean, Ron Blau, Roger D. Olson, Darcy C. Sherman, David Bernstein, Theresia Dillard, Robert P. Klingler, Jessica DeCastro, Lori Curtis, Dori Gilels, Nathan Croom, Gregory Asken, Edward T. Muscara, Michael Wick, Tenisha Burgos, Jason Grala, Kathleen A. Tawney, Kent Busek, Curtis Harr, Cindy Prince, Frances H. Gammell-Roach, Andrew Hedlund, William Dale Picotte, Phillip G. Young, Rita Cornish, Alena Farrell, Jane FitzGerald, Arthur Stukey, Janne Rice, Robert M. Rice, Jr. , Stacey R. Nickell, and Carol Ann Kashishian, Halley Ascher, Whitney Porter, and Carroll Gibbs (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to them and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection and unjust enrichment laws.  Plaintiffs demand a trial by jury, and allege as follows:

## <u>NATURE OF ACTION</u>

1.      This lawsuit is brought as a proposed class action against Defendants Autoliv, Inc., Autoliv ASP, Inc., Autoliv B.V. & Co. KG (collectively, "Autoliv" or "Autoliv Defendants"), Takata Corp., TK Holdings, Inc., Tokai Rika Co., Ltd., TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. (collectively, "Tokai Rika" or "Tokai Rika Defendants"), TRW Deutschland Holding GmbH, TRW Automotive Holdings Corp. (collectively, "TRW" or "TRW Defendants"), Toyoda Gosei Co., Ltd., Toyoda Gosei North America Corp., TG Missouri Corp. (collectively, "Toyoda Gosei" or "Toyoda Gosei Defendants") (all as defined below, and

collectively "Defendants"), and unnamed co-conspirators, manufacturers and/or suppliers of Occupant Safety Restraint Systems (defined below) globally and in the United States, for engaging in a long-running conspiracy to unlawfully fix, raise, maintain and/or stabilize prices, rig bids for and allocate the market and customers in the United States for Occupant Safety Restraint Systems (defined below).  According to the United States Department of Justice ("DOJ"), Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

2.      "Occupant Safety Restraint Systems" are generally comprised of the parts in an automotive vehicle that protect drivers and passengers from bodily harm.  Occupant Safety Restraint Systems include seat belts, airbags, steering wheels or steering systems, and safety electronic systems.

3.      Plaintiffs seek to represent all persons and entities who, during the period from and including January 1, 2003 through such time as the anticompetitive effects of the Defendants' conduct ceased (the "Class Period") purchased or leased a new vehicle in the United States not for resale which included one or more Occupant Safety Restraint System(s) as a component part which were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any-co-conspirator of the Defendants.

4.      The Defendants manufacture, market, and/or sell Occupant Safety Restraint Systems throughout and into the United States.  The Defendants, and their co-conspirators (as yet unknown), agreed, combined, and conspired to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Occupant Safety Restraint Systems.

5.      The U.S. Department of Justice's ("DOJ") Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.  The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and its impact on American consumers and businesses.  The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.4 billion in criminal fines to date.

6.      Defendant Autoliv, Inc. has agreed to plead guilty and pay a $14.5 million fine for its unlawful conduct in conspiring with others to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize and maintain the prices of, Occupant Safety Restraint Systems sold to certain automobile manufacturers in the United States and elsewhere at various times from at least as early as March 2006 and continuing until at least February 2011.  The combination and conspiracy engaged in by Defendant Autoliv, Inc. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

7.      Defendant TRW Deutschland Holding GMBH has agreed to plead guilty and pay a $5.1 million fine for its unlawful conduct in conspiring with others to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize and maintain the prices of, Occupant Safety Restraint Systems sold to certain automobile

manufacturers in the United States and elsewhere at various times from at least as early as January 2008 and continuing until at least June 2011. The combination and conspiracy engaged in by Defendant TRW Deutschland Holding GMBH and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      Defendant Takata Corp. has agreed to plead guilty and pay a $71.3 million fine for its unlawful conduct in conspiring with others to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize and maintain the prices of, Occupant Safety Restraint Systems sold to certain automobile manufacturers in the United States and elsewhere at various times from at least as early as January 1, 2003 and continuing until at least February 2011. The combination and conspiracy engaged in by Defendant Autoliv, Inc. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.      Defendant Toyoda Gosei Co. Ltd. has agreed to plead guilty and pay a $26 million fine for its unlawful conduct in conspiring with others to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, rig bids for, and to fix, stabilize and maintain the prices of, among other products, Occupant Safety Restraint Systems sold to certain automobile manufacturers in the United States and elsewhere at various times from at least as early as September 2003 and continuing until at least September 2010. The combination and conspiracy engaged in by Defendant Toyoda Gosei Co. Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1

10.     The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate sales of, rig bids for, and to fix, stabilize and maintain the prices of Occupant Safety Restraint Systems sold to vehicle manufacturers and others in the United States.  The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection and unjust enrichment laws.

11.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for Occupant Safety Restraint Systems during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a

class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from some of the Defendants.

14.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

15.     This Court has *in personam* jurisdiction over the Defendants because each, either directly or through the ownership and/or control of its subsidiaries, inter alia: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Occupant Safety Restraint Systems throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  The Defendants also conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States.

16.     The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

17.     The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. The Defendants' products are sold in the flow of interstate commerce.

18.     Occupant Safety Restraint Systems manufactured abroad by the Defendants and sold for use in vehicles in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Occupant Safety Restraint Systems are purchased in the United States, and such Occupant Safety Restraint Systems do not constitute import commerce, the Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury in the United States.

19.     By reason of the unlawful activities hereinafter alleged, the Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  The Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Occupant Safety Restraint Systems, which conspiracy unreasonably restrained trade and adversely affected the market for Occupant Safety Restraint Systems.

20.     The Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Occupant Safety Restraint Systems for personal use and not for resale, including Plaintiffs and the Classes.

## PARTIES

### Plaintiffs

21.     Plaintiff Rebecca Lynn Morrow is an Arizona resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

22.     Plaintiff Erica J. Shoaf is an Arizona resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

23.     Plaintiff Tom Halverson is an Arizona resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

24.     Plaintiff Sophie O'Keefe-Zelman is an Arizona resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

25.     Plaintiff Kimberly Bennet is an Arkansas resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

26.     Plaintiff Melissa Barron is a California resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

27.     Plaintiff Meetesh Shah is a California resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

28.     Plaintiff Elizabeth Kaufmann is a Florida resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

29.     Plaintiff Keith Uehara is a Hawaii resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

30.     Plaintiff Jennifer Chase is an Iowa resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

31.    Plaintiff Darrell Senior is a Kansas resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

32.    Plaintiff James E. Marean is a Maine resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

33.    Plaintiff Ron Blau is a Massachusetts resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

34.    Plaintiffs Roger D. Olson is a Michigan resident who purchased Occupant Safety Restraint Systems indirectly from one or more Defendants.

35.    Plaintiff Darcy C. Sherman is a Minnesota resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

36.    Plaintiff David Bernstein is a Minnesota resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

37.    Plaintiff Theresia Dillard is a Mississippi resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

38.    Plaintiff Robert P. Klingler is a Missouri resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

39.    Plaintiff Jessica DeCastro is a Missouri resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

40.    Plaintiff Lori Curtis is a Missouri resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

41.    Plaintiff Dori Gilels is a Montana resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

42.     Plaintiff Nathan Croom is a Nebraska resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

43.     Plaintiff Gregory Asken is a Nevada resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

44.     Plaintiff Edward T. Muscara is a New Hampshire resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

45.     Plaintiff Michael Wick is a New Mexico resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

46.     Plaintiff Tenisha Burgos is a New York resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

47.     Plaintiff Jason Grala is a New York resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

48.     Plaintiff Kathleen A. Tawney is a North Carolina resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

49.     Plaintiff Kent Busek is a North Dakota resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

50.     Plaintiff Curtis Harr is a North Dakota resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

51.     Plaintiff Cindy Prince is an Oregon resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

52.     Plaintiff Frances H. Gammell-Roach is a Rhode Island resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

53.     Plaintiff Andrew Hedlund is a South Carolina resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants

54.     Plaintiff William Dale Picotte is a South Dakota resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

55.     Plaintiff Phillip G. Young is a Tennessee resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

56.     Plaintiff Rita Cornish is a Utah resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

57.     Plaintiff Alena Farrell is a Vermont resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

58.     Plaintiff Jane FitzGerald is a Vermont resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

59.     Plaintiff Arthur Stukey is a Vermont resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

60.     Plaintiff Janne Rice is a West Virginia resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

61.     Plaintiff Robert M. Rice, Jr. is a West Virginia resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

62.     Plaintiff Stacey R. Nickell is a West Virginia resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

63.     Plaintiff Carol Ann Kashishian is a Wisconsin resident who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

64.     Plaintiff Halley Ascher is a resident of the District of Columbia who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

65.     Plaintiff Whitney Porter is a resident of the District of Columbia who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

66.     Plaintiff Caroll Gibbs is a resident of the District of Columbia who purchased an Occupant Safety Restraint System indirectly from one or more Defendants.

**Defendants**

**The Takata Defendants**

67.     Takata Corp. ("Takata") is a Japanese corporation with its principal place of business in Tokyo, Japan.  Takata—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.

68.     TK Holdings, Inc. ("TK"), is a Delaware corporation with its principal place of business in Auburn Hills, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Takata.  TK manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

**The Autoliv Defendants**

69.     Autoliv, Inc. is a Delaware corporation with its principal place of business in Stockholm, Sweden.  Autoliv, Inc.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Occupant Safety Restraint

Systems that were purchased throughout the United States, including in this district, during the Class Period.

70.     Autoliv ASP, Inc. is an Indiana corporation with its principal place of business in Ogden, Utah.  It is a subsidiary of and wholly owned and/or controlled by its Swedish parent, Autoliv, Inc.  Autoliv ASP, Inc. manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Swedish parent.

71.     Autoliv B.V. & Co. KG is a German corporation with its principal place of business in Elmshorn, Germany.  It is a subsidiary of and wholly owned and/or controlled by its Swedish parent, Autoliv, Inc.  Autoliv B.V. & Co. KG manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Swedish parent.

**The Tokai Rika Defendants**

72.     Tokai Rika Co., Ltd. is a Japanese corporation with its principal place of business in Aichi, Japan.  Tokai Rika Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.

73.     TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Tokai Rika Co., Ltd.  TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc.

13

manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

**The TRW Deutschland Holding GMBH Defendants**

74.     TRW Deutschland Holding GMBH ("TRW GMBH") is a German corporation with is principal place of business in Koblenz, Germany.  TRW GMBH—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.

75.     TRW Automotive Holdings Corp. ("TRW") is a Delaware corporation with its principal place of business in Livonia, Michigan.  TRW—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.

**The Toyoda Gosei Defendants**

76.     Toyoda Gosei Co., Ltd. ("Toyota Gosei") is a Japanese corporation with its principal place of business in Aichi, Japan.  Toyoda Gosei—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.

77.     Toyoda Gosei North America Corp. is a Michigan corporation with its principal place of business in Troy, Michigan.  It is a subsidiary of and wholly owned and/or controlled by

its Japanese parent, Toyoda Gosei.  Toyoda Gosei North America Corp. manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

78.   TG Missouri Corp. is a Missouri corporation with its principal place of business in Perryville, Missouri.  It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Toyoda Gosei.  TG Missouri Corp. manufactured, marketed and/or sold Occupant Safety Restraint Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

## AGENTS AND CO-CONSPIRATORS

79.   Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged.

80.   Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

81.   Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

15

## FACTUAL ALLEGATIONS

### A.    The Occupant Safety Restraint System Industry

82.    Occupant Safety Restraint Systems are generally comprised of the parts in an automotive vehicle that protect drivers and passengers from bodily harm.  Occupant Safety Restraint Systems include seat belts, air bags, steering wheels (or steering systems), and safety electronic systems.  See Figure 1.



Figure 1.

83.    Occupant Safety Restraint Systems are installed by vehicle original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They are also installed in cars to replace worn out, defective or damaged Occupant Safety Restraint Systems.

84.    For new cars, OEMs – mostly large automotive manufacturers – purchase Occupant Safety Restraint Systems directly from the Defendants.

85.    When purchasing Occupant Safety Restraint Systems, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers.  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years.  Typically, the bidding process begins

16

approximately three years prior to the start of production of a new model.  Japanese OEMs

procure parts for U.S.-manufactured vehicles both in Japan and the United States.

86.     The Defendants and their co-conspirators supplied Occupant Safety Restraint

Systems to OEMs for installation in vehicles manufactured and sold in the United States and

elsewhere.  The Defendants and their co-conspirators manufactured Occupant Safety Restraint

Systems (a) in the United States for installation in vehicles manufactured and sold in the United

States, (b) in Japan and elsewhere for export to the United States and installation in vehicles

manufactured and sold in the United States, and (c) in Japan and elsewhere for installation in

vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

87.     Plaintiffs and members of the proposed Classes purchased Occupant Safety

Restraint Systems indirectly from one or more of the Defendants.  By way of example, an owner

or lessee of a vehicle may indirectly purchase an Occupant Safety Restraint Systems from the

Defendants as part of purchasing or leasing the new vehicle.

88.     According to Autoliv's 2011 Annual Report, the global market for Occupant

Safety Restraint Systems in 2010 was $18.1 billion and the North American market for Occupant

Safety Restraint Systems was $4.2 billion.

89.     The global Occupant Safety Restraint Systems market is dominated and

controlled by large manufacturers, the top three of which are Defendants who control almost

75% of the market.  The Autoliv Defendants account for more than 33% of the global market for

Occupant Safety Restraint Systems; as Autoliv states in its 2011 Annual Report, it is "the

world's largest automotive safety supplier with sales to all the leading car manufacturers in the

world."  TRW accounts for approximately 20% of the global market for Occupant Safety

Restraint Systems.  And the Takata Defendants account for approximately 20% of the Occupant

Safety Restraint Systems global market.

90.     By virtue of their market shares, Defendants are the dominant manufacturers and

suppliers of Occupant Safety Restraint Systems in the United States and the world.

91.     Airbags are a type of Occupant Safety Restraint System.  Airbags are occupant

restraints designed to control the movement of an occupant inside a vehicle in the event of a

collision.  An Airbag consists of a light fabric air bag, an inflator, which through use of

pressurized gas (typically generated by pyrotechnic materials), rapidly inflates the Airbag upon

deployment, and an initiator to initiate the deployment.  It may also include, depending on the

requirements of the vehicle manufacturer, an injection molded plastic decorative cover or other

devices associated with the Airbag.   According to the National Highway Traffic Safety

Administration, a typical new Airbag retailed for approximately $1,000 from a car dealer in

2011.

92.     In 2012, the total dollar-value of Airbags sold in the U.S. reached $6.7 billion.

(see Figure 2).



93.     According to Autoliv's website, it manufactures more than one-third of the Airbags sold in North America and according to its 2011 10-K, Autoliv manufactures over 40% of the side Airbags and almost 30% of the frontal Airbags sold in the world.  TRW, Takata, and Toyoda Gosei are also major manufacturers of Airbags.

94.     Seatbelts are another type of Occupant Safety Restraint System.  Seatbelts are safety strap restraints designed to secure an occupant in position in a vehicle in the event of a collision.  A Seatbelt includes belt webbing, a buckle, a retractor, and hardware for installation in a vehicle.  It may also include, depending on the requirements of the vehicle manufacturer, a height adjuster, a pretensioner, or other devices associated with the Seatbelt.

95.     In 2012, the total dollar-value of Seatbelts sold in the U.S. reached over $900 million. (see Figure 3).



Figure 3.

96.     According to Autoliv's website, it manufactures almost one-third of the Seatbelts sold North America, and according to its 2011 10-K, Autoliv manufactures 40% of the Seatbelts sold in the world.  TRW and Takata are also major manufacturers of Seatbelts.

97.     Steering Wheels are another type of Occupant Safety Restraint System.   Steering Wheels consist of a die-cast armature (frame) covered by molded polyurethane.  Steering Wheels are then finished with leather, wood trim, or plastic, and may include various electronic features and controls, depending on the requirements of a vehicle manufacturer.

98.     In 2012, the dollar-value for Steering Wheels and related components sold in the U.S. reached $2.24 billion.  (see Figure 4).



Figure 4.

99.     According to its website, Autoliv manufactures more than 15% of the Steering Wheels sold in North America, and in its 2011 10-K, Autoliv states that it manufactures almost 30% of the Steering Wheels sold in the world.  TRW, Takata, and Toyoda Gosei are also major manufacturers of Steering Wheels.

**B.   The Structure and Characteristics of the Occupant Safety Restraint Systems Market Render the Conspiracy More Plausible**

100.     Characteristics of the Occupant Safety Restraint Systems market in the United States are conducive to a price-fixing and market allocation agreement, and have made collusion

20

particularly attractive in this market.  Specifically, the Occupant Safety Restraint Systems market (1) has barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

      **1.**     **The Occupant Safety Restraint Systems Market Has High Barriers to Entry**

101.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

102.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Occupant Safety Restraint Systems market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

103.    Research and development is necessary for product innovation as players in this industry compete primarily based on product pricing.  Airbags are constantly researched for better deployment speeds, Seatbelts are constantly researched for better functionality and quality, and Steering Wheels are constantly researched for better precision and rotation.  In order to effectively compete, an entrant must be committed to spending a significant amount of resources on research and development.

104.    Defendants also own several patents for Occupant Safety Restraint Systems.  For example, TRW owns Airbag, Steering Wheel and Seatbelt patents.  These patents place a

significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

105.    In addition, OEMs cannot change Occupant Safety Restraint Systems suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Occupant Safety Restraint Systems it purchases for a vehicle are then integrated with the electronics and mechanics of the particular vehicle model.  Thus, Occupant Safety Restraint Systems manufacturers and OEMs must agree on a design that is unique to a particular vehicle model.  It would be difficult for a new market entrant to do so.

### 2.    There is Inelasticity of Demand for Occupant Safety Restraint Systems

106.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

107.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

108.    Demand for Occupant Safety Restraint Systems is highly inelastic.  Demand for Occupant Safety Restraint Systems is inelastic because there are no close substitutes for these products.  In addition, customers must purchase Occupant Safety Restraint Systems as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### 3.     The Market for Occupant Safety Restraint Systems Is Highly Concentrated

109.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices.   There is a high level of concentration among firms in the Occupant Safety Restraint Systems market.

110.     As discussed above, Defendants dominate the Occupant Safety Restraint Systems market.  Three of the Defendants control almost 75% of the global market.

### 4.     Defendants Had Ample Opportunities to Conspire

111.     Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.  In a June 6, 2012 press release, the DOJ explained that Defendant Autoliv and its co-conspirators met in secret and agreed to allocate the supply of various automotive parts.  According to the Autoliv information, Autoliv and its co-conspirators participated in meetings, conversations and communications to discuss and agree on the bids and price quotations to be submitted to certain automobile manufacturers for Occupant Safety Restraint Systems, and agreed, during meetings, conversations and communications, to allocate the supply of Occupant Safety Restraint Systems sold to certain automobile manufacturers on a model-by-model basis.

### C.  Global Government Investigation into Price-Fixing in the Automotive Parts Industry

112.     A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada and Japan, aimed at suppliers of automotive parts in general, and Occupant Safety Restraint Systems in particular.  A Japanese Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts investigation would continue to widen because the automotive industry as a whole comprises many sub-industries.

He characterized the investigation being conducted by international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

113.     The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").  The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

114.     On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers  The DOJ has confirmed that its auto parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct.  The DOJ has levied more than $3.4 billion in criminal fines have already been levied against various automotive parts manufacturers.

115.     Defendants Autoliv, TRW, and Takata have admitted that they are cooperating with the antitrust investigators.  Autoliv, Inc. stated in its 2011 Annual Report that its subsidiary, Autoliv ASP, Inc., received a grand jury subpoena from the Antitrust Division of the United States Department of Justice on February 8, 2011.  "The subpoena requested documents and information as part of a long-running investigation into possible anticompetitive behavior among certain suppliers to the automotive vehicle industry, including Autoliv."  Autoliv, Inc.'s 2011 Annual Report also stated that, on June 7-9, 2011, representatives of the EC visited two facilities of Autoliv B.V. & Co. KG to gather information for a similar inquiry.

116.     TRW stated in its 2011 Annual Report that "in June 2011, European antitrust authorities visited certain of our Occupant Safety Systems business unit locations in Germany to

gather information. We also received a subpoena related to the Antitrust Investigations in the United States from the U.S. Department of Justice."

117.    On February 23, 2010, investigators from the FBI raided the Plymouth, Michigan offices of Tokai Rika as part of a federal antitrust investigation.  Special Agent Sandra Berchtold stated that the affidavits containing facts supporting issuance of the search warrants were filed in federal court under seal.

118.    Takata Corp. stated in its 2011 Annual Report that TK Holdings, Inc., a U.S. subsidiary, "became the subject to an investigation conducted by the Federal Bureau of Investigation on February 8, 2011.  TK Holdings, Inc. is cooperating fully with the investigation."  Alby Berman, vice-president of marketing and public relations for TK Holdings, Inc., said the subpoena "targeted safety system suppliers – seat belts, air bags, steering wheels and safety electronics – any communications with competitors, and specifically mentioned Tokai Rika" and that the subpoena targeted communications dating back to January 1, 2005.  Special Agent Sandra Berchtold, media coordinator for the FBI, confirmed that the FBI raided TK Holdings, Inc.'s Auburn offices.

119.    To obtain the search warrant to raid TK Holdings, Inc., the FBI was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate.  That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**D. Defendant Autoliv, Inc. Pleads Guilty to Price-Fixing Occupant Safety Restraint Systems**

120.     On June 6, 2012, the DOJ announced that Defendant Autoliv agreed to pay a $14.5 million criminal fine and plead guilty to a two-count criminal Information charging it with participating in:  (i) a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of certain seatbelts sold to one Japanese automobile manufacturer in the United States and elsewhere from at least as early as May 2008 continuing until at least February 2011 in violation of the Sherman Act, 15 U.S.C. § 1 ; and (2) a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of certain seatbelts, airbags, and steering wheels sold to a second Japanese automobile manufacturer in the United States and elsewhere from at least as early as March 2006 and continuing until at least February 2011 in violation of the Sherman Act, 15 U.S.C. § 1. According to the Information filed, Defendant Autoliv, Inc. and its co-conspirators carried out the Occupant Safety Restraint Systems conspiracy by:

(a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to automobile manufacturers for Occupant Safety Restraint Systems;

(b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers for Occupant Safety Restraint Systems;

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Occupant Safety Restraint Systems sold to automobile manufacturers on a model-by-model basis;

(d) submitting bids and price quotations to automobile manufacturers in accordance with the agreements reached;

(e) selling Occupant Safety Restraint Systems to automobile manufacturers at collusive and noncompetitive prices; and

(f) accepting payment for Occupant Safety Restraint Systems sold to automobile manufacturers at collusive and noncompetitive prices.

121.    In addition to Autoliv, Takayoshi Matsunaga, the former Vice President of the Toyota Global Business Unit at Autoliv Japan, pleaded guilty to a one count Criminal Information charging him with  participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain seat belts sold to Toyota in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  In connection with his guilty, plea, Matusnaga was criminally fined $20,000 and sentence to serve one year and one day in a U.S. prison.

**E.    Defendant TRW Deutsch Holding GmbH Pleads Guilty to Price-Fixing Occupant Safety Restraint Systems**

122.    On July 30, 2012, the DOJ announced that Defendant TRW Deutsch Holding GmbH agreed to pay a $5.1 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts, airbags, and steering wheels sold to two German automobile manufacturers in the United States and elsewhere from at least as early as January 2008 and continuing until at least June 2011 in violation of the Sherman Act, 15 U.S.C. § 1.  According to the Information filed, Defendant TRW Deutsch Holding GmbH and its co-conspirators carried out the Occupant Safety Restraint Systems conspiracy by:

(a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to two German Automobile manufacturers for Occupant Safety Restraint Systems;

(b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to two German automobile manufacturers for Occupant Safety Restraint Systems;

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Occupant Safety Restraint Systems sold to two German automobile manufacturers on a model-by-model basis;

(d) submitting bids and price quotations to two German automobile manufacturers in accordance with the agreements reached;

(e) selling Occupant Safety Restraint Systems to two German automobile manufacturers at collusive and noncompetitive prices; and

(f) accepting payment for Occupant Safety Restraint Systems sold to two German automobile manufacturers at collusive and noncompetitive prices.

### F.   Defendant Takata Corporation Pleads Guilty to Price-Fixing Occupant Safety Restraint Systems

123.    On October 9, 2013, Defendant Takata Corporation announced that it agreed to pay a $71.3 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of certain seatbelts sold to automobile manufacturers, including, Toyota, Honda, Nissan, Fuji Heavy Industries, Ltd. (Subaru), and Mazda, in the United States and elsewhere from at least as early as January 1, 2003 and continuing until at least February 2011 in violation of the Sherman Act, 15 U.S.C. § 1.  According to the Information filed, Defendant Takata Corporation and its co-conspirators carried out the Occupant Safety Restraint Systems conspiracy by:

(a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to certain automobile manufacturers for Occupant Safety Restraint Systems;

(b) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers for Occupant Safety Restraint Systems;

(c) agreeing, during those meetings, conversations, and communications, to allocate the supply of Occupant Safety Restraint Systems sold to certain automobile manufacturers on a model-by-model basis;

(d) submitting bids and price quotations to certain automobile manufacturers in accordance with the agreements reached;

(e) selling Occupant Safety Restraint Systems to certain automobile manufacturers at collusive and noncompetitive prices; and

(f) accepting payment for Occupant Safety Restraint Systems sold to certain automobile manufacturers at collusive and noncompetitive prices.

124.    On November 21, 2013, the DOJ announced that three high-level Takata executives, Yasuhiko Ueno, Saburo Imamiya, and, Yoshinobu Fujino pleaded guilty to three separate one-count criminal Informations charging them with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts sold to Toyota, Honda, Nissan, Fuji Heavy Industries, Ltd. (Subaru), and Mazda in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  In connection with their guilty pleas, the Takata executives were criminally fined $20,000 each and sentenced to serve between 14 and 19 months in U.S.

prison. Ueno's criminal Information notes that was employed by Defendant TK Holdings Inc., in the United States as senior vice president for sales for Japanese manufacturers from at least January 2006 through December 2007.

125. A fourth Takata executive, Gary Walker – employed by Defendant TK Holdings, Inc. – pleaded guilty to a one-count criminal Information charging him with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain seatbelts sold to Toyota, Honda, Nissan, Fuji Heavy Industries (Subaru) and Mazda in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1. In connection with his guilty plea, Walker was criminally fined $20,000 and sentenced to serve 14 months in a U.S. prison.

126. A fifth Takata executive, Gikou Nakajima, was indicted on June 5, 2014 for his participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts sold to Honda, Nissan, Fuji Heavy Industries (Subaru) and Mazda in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1

## G. Defendant Toyoda Gosei Co., Ltd, Pleads Guilty to Price-Fixing Occupant Safety Restraint Systems

127. On September 29, 2014, the DOJ announced that Defendant Toyoda Gosei Co., Ltd. agreed to pay a $26 million criminal fine and plead guilty to a two-count criminal Information charging it with participating in conspiracies to: (1) allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to Toyota in the United States and elsewhere from at least as early as February 2004 and continuing until at least September 2010 in violation of the Sherman Act, 15 U.S.C. § 1; and (2) allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels

sold to Subaru and Toyota in the United States and elsewhere from at least as early as September

2003 and continuing until at least September 2010 in violation of the Sherman Act, 15 U.S.C. §

128. According to the Information filed, Defendant Toyoda Gosei Co., Ltd. and its co-conspirators carried out the Occupant Safety Restraint Systems conspiracy by:

(a) participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to Subaru and Toyota for Occupant Safety Restraint Systems;

(b) agreeing, during those meetings, conversations, and communications, to allocate among the companies certain sales of certain Occupant Safety Restraint Systems sold to Subaru and Toyota;

(c) agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to Subaru and Toyota;

(d) exchanging information on bids and price quotations to be submitted to Subaru and Toyota;

(e) submitting bids and price quotations to Subaru and Toyota in accordance with the agreements;

(f) selling Occupant Safety Restraint Systems to Subaru and Toyota at collusive and noncompetitive prices; and

(g) accepting payment for Occupant Safety Restraint Systems sold to Subaru and Toyota at collusive and noncompetitive prices.

**H. Likely Existence of a Cooperating Defendant**

129. The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA")

provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses

its conduct to the Department of Justice.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

130.    In light of the multiple guilty pleas in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

## I.   Additional Criminal Pleadings in the Automotive Parts Industry

131.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. had agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price-fixing and bid rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

132.    In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A Pozen, then the Acting Assistant Attorney General in charge of the DOJ's Antitrust division, said that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers."  Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."  The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the

United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

133.    On January 30, 2012, the DOJ announced that Yazaki Corporation, as stated above, had agreed to plead guilty and to pay a $470 million criminal fine and DENSO Corporation had agreed to plead guilty and to pay a $78 million criminal fine for their respective involvement in multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to automobile manufacturers in the United States.   According to the two-count felony charge against DENSO Corporation, it engaged in conspiracies to rig bids for and to fix, stabilize and maintain the prices of electronic control units and heater control panels.

134.    Also on January 30, 2012, four executives from Yazaki Corporation (all Japanese nationals) – Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa, and Hisamitsu Takada – agreed to plead guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  These four executives of Yazaki Corporation will serve prison time ranging from 15 months to two years.  The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

135.    In the press release announcing the fines against Yazaki Corporation, its executives, and DENSO Corporation, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ."  In the same press release, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has as significant impact on the automotive manufacturers in the United States, Canada, Japan and

Europe and has been occurring for at least a decade.  The conduct has also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

136.    Ms. Pozen said there is no doubt **consumers** were hurt financially by the automotive wire harness price-fixing conspiracy.  She stated:  "By rigging bids on wiring harnesses . . . the three companies inflated what some of their auto manufacturer clients paid, and indirectly, what consumers paid for some cars."

137.    On April 3, 2012, the DOJ announced that G.S. Electech Inc. had agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to fix the prices of speed sensor wire assemblies used on antilock brake systems installed in United States automobiles.

138.    On April 23, 2012, the DOJ announced that Fujikura Ltd. had agreed to plead guilty and to pay a $220 million criminal fine for its role in a conspiracy to fix prices of automotive wire harnesses and related products installed in United States automobiles.

139.    On June 6, 2012, the DOJ announced that Defendant Autoliv Inc. agreed to plead guilty and to pay a $14.5 million criminal fine for its involvement in the conspiracy alleged herein.

140.    On July 30, 2012, the DOJ announced that Defendant TRW Deutschland Holding GmbH agreed to plead guilty and to pay a $5.1 criminal fine for its involvement in the conspiracy alleged herein.

141.    On October 30, 2012, the DOJ announced that Defendant Tokai Rika Co. Ltd. agreed to plead guilty and to pay a $17.7 million criminal fine for its role in a conspiracy to fix prices of heater control panels installed in automobiles sold in the United States and elsewhere.

Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

142.     On February 15, 2013, Scott Hammond, the deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomas Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  *I say the biggest with respect to the __impact on U.S. businesses and __consumers__, and the number of companies and executives that are subject to the investigation.*" (emphasis added).

143.     On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its role in a conspiracy to fix prices of ignition coils installed in automobiles sold in the United States and elsewhere.

144.     In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

145.     On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts including HID ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

146.     On September 26, 2013, nine additional Japanese automotive suppliers agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different products:

(a) Hitachi Automotive Systems Ltd. agreed to plead guilty and to pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive parts including starter motors, alternators, air flow meters, valve timing control devices, fuel injection systems, electronic throttle bodies, ignition coils, inverters and motor generators sold to automobile manufacturers in the United States and elsewhere;

(b) Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere.  Mitsuba also agreed to plead guilty to one count of obstruction of justice because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

(c) Mitsubishi Electric Corporation agreed to plead guilty and to pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d) Mitsubishi Heavy Industries Ltd. agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sol to automobile manufacturers in the United States and elsewhere;

(e) T.RAD Co. Ltd. agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of

radiators and automatic transmission fluid warmers (ATF warmers) sold to automobile

manufacturers in the United States and elsewhere;

(f) Valeo Japan Co. Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for

its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize

and maintain the prices of air conditioning systems sold to automobile manufacturers in

the United States and elsewhere;

(g) JTEKT Corporation agreed to plead guilty and to pay a $103.27 million criminal fine for

its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize

and maintain the prices of bearings and electric powered steering assemblies sold to

automobile manufacturers in the United States and elsewhere;

(h) NSK Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its

participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and

maintain the prices of bearings sold to an automobile manufacturer in the United States

and elsewhere; and

(i) Yamashita Rubber Co. Ltd. agreed to plead guilty and to pay $11 million criminal fine

for its participation in a conspiracy to rig bids for, and to fix, raise and maintain the prices

of automotive anti-vibration rubber products sold in the United States and elsewhere to

automobile manufacturers.

147.    On the same day, September 26, 2013, United States Attorney General Eric

Holder in the Antitrust Division presented the DOJ's most recent findings in the ongoing

automotive parts investigation.  He stated "[t]hese international price-fixing conspiracies affected

more than $5 billion in automobile parts sold to U.S. car manufacturers.  In total, more than 25

million cars purchased by American consumers were affected by the illegal conduct."  Holder

also described how the conspiracies worked:  "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies.  In order to keep their illegal conduct secret, they used code names and met in remote locations.  Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."  Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers.  As a result of these conspiracies, Americans paid more for their cars."

     148.    The diagram below, which was prepared by the DOJ, illustrates the September 26,



2013 guilty pleas and the corresponding automotive parts to which the various manufacturers

have admitted price-fixing.

149.    On October 9, 2013, Defendant Takata Corporation announced that  it had agreed

to plead guilty and pay a $71.3 million criminal fine for its participation in the conspiracy

alleged herein.

150.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber co. Ltd.

had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate

conspiracies to fix the prices of automotive components involving anti-vibration rubber and

driveshaft parts installed in automobiles in the United States and elsewhere.

151.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. had

agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a

conspiracy to fix prices of automotive high-intensity discharge (HID) lamp ballasts installed in

automobiles sold in the United States and elsewhere.

152.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co., Ltd. had

agreed to plead guilty and to pay a $56.6 million criminal fine for its role in price-fixing

conspiracies involving HID ballasts and automobile lighting fixtures installed in cars sold in the

United States and elsewhere.

153.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. had agreed

to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy

involving electronic throttle bodies sold to an automobile manufacturer in the United States and

elsewhere.

154.    On February 13, 2014, the DOJ announced that Bridgestone Corp. had agreed to

plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of

39

automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

155.     On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

156.     On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in cars sold to automobile manufacturers in the United States and elsewhere.

157.     On September 29, 2014, the DOJ announced that Defendant Toyoda Gosei Co. Ltd. agreed to plead guilty and to pay a $26 million criminal fine for its involvement in the conspiracy alleged herein as well as its involvement in a conspiracy to fix and rig bids for automotive hoses installed in cars sold to automobile manufacturers in the United States and elsewhere.

158.     On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. agreed to plead guilty and to pay a $1.25 million criminal fine for its role in a conspiracy to fix prices and rig bids for automotive brake hose installed in cars sold in the United States and elsewhere.

159.     On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

160.    To date, thirty-one companies pleaded guilty or agreed to plead guilty and forty-six executives have been charged in the Antitrust Division's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry.  Each of the twenty-nine companies has agreed to plead guilty and altogether, they have agreed to pay more than $2.4 billion in criminal fines.

161.    "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena.  "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said.  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

## CLASS ACTION ALLEGATIONS

162.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities who, during the Class Period, purchased or leased a new vehicle in the United States not for resale which included one or more Occupant Safety Restraint System(s) as a component part which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant or any co-conspirators of the Defendants.

163.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment on behalf of the following class (the "Damages Class"):

All persons and entities who, during the Class Period, purchased or leased a new vehicle in the Indirect Purchaser States[1] not for resale which included one or more Occupant Safety Restraint System (s) as a component part which were manufactured or sold by a Defendant, any current or former subsidiary of a Defendant or any co-conspirator of the Defendants.

164.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Occupant Safety Restraint Systems directly or for resale.

165.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

166.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Occupant Safety Restraint Systems sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

---

[1] The Indirect Purchaser States are the states listed in the Second and Third Claims for Relief.

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, as alleged in the Second and Third Claims for Relief;

(f)     Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

(g)     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Occupant Safety Restraint Systems sold in the United States during the Class Period;

(i)     Whether Plaintiffs and members of the Classes had any reason to know or suspect the conspiracy, or any means to discovery the conspiracy;

(j)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

167.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Occupant Safety Restraint Systems purchased indirectly from the Defendants and/or their co-conspirators.

168.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

169.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

170.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

171.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

172.    The Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to Occupant Safety Restraint Systems;

(b)      The prices of Occupant Safety Restraint Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)      Indirect purchasers of Occupant Safety Restraint Systems have been deprived of free and open competition;

(d)      Indirect purchasers of Occupant Safety Restraint Systems paid artificially inflated prices.

173.     During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Occupant Safety Restraint Systems.  OEMS and automotive dealers passed on inflated prices to Plaintiffs and the members of the Classes. Those overcharges have unjustly enriched Defendants.

174.     The markets for Occupant Safety Restraint Systems and the market for cars are inextricably linked and intertwined because the market for Occupant Safety Restraint Systems exists to serve the vehicle market.  Without the vehicles, the Occupant Safety Restraint Systems have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Occupant Safety Restraint Systems.  As stated in the 2010 Annual Report of Lear Corporation, an automobile parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

175.     Occupant Safety Restraint Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Occupant Safety Restraint Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and cost changes attributable to Occupant Safety

Restraint Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

176.    Just as Occupant Safety Restraint Systems can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Occupant Safety Restraint Systems affect prices paid by indirect purchasers of new motor vehicles containing Occupant Safety Restraint Systems and of Occupant Safety Restraint Systems purchased for repair purposes.

177.    While even a monopolist would increase its prices when the cost of its inputs increased, the economic necessity of passing through cost changes increases with the degree of competition a firm faces.  The OEM and dealer markets for new motor vehicles are subject to vigorous price competition.  The OEMs and dealers have thin net margins, and are therefore at the mercy of their component costs, such that increases in the price of components such as Occupant Safety Restraint Systems lead to corresponding increases in prices for new motor vehicles at the OEM and dealer levels.  When downstream distribution markets are highly competitive, as they are in the case of new motor vehicles containing Occupant Safety Restraint Systems as components, overcharges are passed through to ultimate consumers, such as the indirect-purchaser Plaintiffs and members of the Classes.

178.    Hence, the inflated prices of Occupant Safety Restraint Systems both in new motor vehicles and those purchased for repair resulting from Defendants' bid rigging and price-fixing conspiracy have been passed on to Plaintiffs and the other members of the Classes by OEMs and dealers.

179.    The economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component.

Two antitrust scholars – Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust) – have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[2]

180.    As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers.  When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets.  This general phenomenon of cost pass through is well established in antitrust laws and economics as well.[3]

181.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Occupant Safety Restraint Systems and, as a direct and foreseeable result, the price of new motor vehicles containing Occupant Safety Restraint Systems and the price of Occupant Safety Restraint Systems purchased for repair purposes.  Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in

---

[2] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. PA. L. REV. 268, 275 (1979).

[3] Order re: Class Certification at 13-14, *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*, No. J.C.C.P. No. 4106, (Cal. Sup. Ct. Aug. 29, 2000).

the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of Occupant Safety Restraint Systems on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time.  A regression model can explain how variation in the price of Occupant Safety Restraint Systems affects changes in the price of new motor vehicles. In such models, the price of Occupant Safety Restraint Systems would be treated as an independent or explanatory variable.  The model can isolate how changes in the price of Occupant Safety Restraint Systems impact the price of new motor vehicles containing Occupant Safety Restraint Systems while controlling for the impact of other price-determining factors.

182.  The precise amount of the overcharge impacting the prices of new motor vehicles containing Occupant Safety Restraint Systems can be measured and quantified.  Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed-through the chain of distribution.  Thus, the economic harm to Plaintiffs and the class members can be quantified.

183.  In addition to the regression analysis discussed above demonstrating impact on consumers, the Department of Justice's Antitrust Division, which has been investigating this cartel for some time, **has concluded that there is "no doubt" that consumers were hurt financially**.  Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division said:  "By rigging bids . . . the three companies inflated what some of their auto manufacturing clients paid, and indirectly, what consumers paid for some cars.  Pozen

said."  "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," Pozen said.  "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."  Pozen went on to say that there was no doubt that consumers were hurt financially by the cartel's activity.  In a separate press statement, Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ."

184.    The scheme drove up costs for consumers since the prices were illegally fixed on expensive electrical parts and have risen in cost as cars have come more complex in recent years, Jim Gillette, an analyst with the firm HIS Automotive, has said.  Gillette estimated that the price-fixing of wire harnesses alone cost carmakers hundreds of millions of dollars.  Climate control units are even more expensive because they have become more than just dials and switches in recent years.   Even entry-level cars have digital controls that allow drivers and passengers to set their own temperatures.

185.    On February 15, 2013, Scott Hammond, the deputy assistant attorney general in the DOJ's Antitrust Division, discussed DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  *I say biggest with respect to the **impact** on U.S. businesses and **consumers**, and the number of companies and executives that are subject to the investigation*."  (emphasis added).

186.     On September 26, 2013, United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's then most recent findings in the ongoing automotive parts investigation.  He stated "[t]hese international price-fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers.  In total, more than 24 million cars purchased by American consumers were affected by the illegal conduct."  Holder also described how the conspiracies worked:  "[c]ompany executives met face to face in the United states and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies.  In order to keep their illegal conduct secret, they used code names and met in remote locations.  Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."  Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers.  As a result of these conspiracies, Americans paid more for their cars."

187.     On May 25, 2014, news sources reported that Brent Snyder, a deputy assistant attorney general in the Antitrust Division, said with respect to the automotive parts conspiracies, "[i]t's a very, very safe assumption that U.S. consumers paid more, and sometimes significantly more, for their automobiles as a result of this conspiracy."

188.     By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Occupant Safety Restraint Systems than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

**A.** **The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims**

189.    Plaintiffs repeat and re-allege the allegations set forth above.

190.    Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until the public announcements of the government investigations into price-fixing of Occupant Safety Restraint Systems began in February 2011.[4]

191.    Plaintiffs and members of the Classes are consumers who purchased or leased vehicles. They had no direct contact or interaction with the Defendants and had no means from which they could have discovered the combination and conspiracy described in this Complaint before the public announcements of the government investigations began in February 2011.

192.    No information in the public domain was available to Plaintiffs and members of the Classes prior to the public announcements of the government investigations beginning in February 2011 that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to price-fix Occupant Safety Restraint Systems. Plaintiffs and members of the Classes had no means of obtaining any facts or information concerning any aspect of the

---

[4] With respect to the Toyoda Gosei Defendants, Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein until (at the earliest), September 29, 2014, the date that the DOJ reported that Toyoda Gosei had pleading guilty to conspiring to fix the prices of Occupant Safety Restraint Systems. No information in the public domain was available to the Plaintiffs and the members of the Classes prior to September 29, 2014 that revealed sufficient information to suggest that Toyoda Gosei was involved in a conspiracy to price-fix Occupant Safety Restraint Systems. Therefore, with respect to the Toyoda Gosei Defendants, the statute of limitations did not begin to run because Plaintiffs and the members of the Classes did not and could not discover their claims, or in the alternative, because fraudulent concealment tolled the statute of limitations, until September 29, 2014.

Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their

co-conspirators had engaged in the combination and conspiracy alleged herein.

193.    For these reasons, the statute of limitations as to Plaintiffs and the Classes' claims

did not begin to run, and has been tolled with respect to the claims that Plaintiffs and members of

the Classes have alleged in this Complaint.

### B.   Fraudulent Concealment Tolled the Statute of Limitations

194.    In the alternative, application of the doctrine of fraudulent concealment tolled the

statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and

members of the Classes did not discover, and could not discover through the exercise of

reasonable diligence, the existence of the conspiracy alleged herein until February 2011, when

the public announcements of the government investigations into Occupant Safety Restraint

Systems price-fixing began.[5]

195.    Before that time, Plaintiffs and members of the Classes were unaware of

Defendants' unlawful conduct, and did not know before then that they were paying supra-

competitive prices for Occupant Safety Restraint Systems throughout the United States during

the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs

and members of the Classes that even hinted to Plaintiffs that they were being injured by the

Defendants' unlawful conduct.

196.    The affirmative acts of the Defendants alleged herein, including acts in

furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

precluded detection.

---

[5] See footnote 4.

197.    By its very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing.  Occupant Safety Restraint Systems are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the Occupant Safety Restraint Systems industry to be a competitive industry. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Occupant Safety Restraint Systems prices before the public announcements of the government investigations began in February 2011.

198.    Plaintiffs and members of the Classes could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

199.    Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof.  Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations.  The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs.  The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty to criminal violations of the Sherman Act.

200.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until the public announcements of the government investigations began in February 2011.

201.     For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until February 2011.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

202.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

203.     Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

204.     The acts done by each of the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

205.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Occupant Safety Restraint Systems, thereby creating anticompetitive effects.

206.     The anti-competitive acts were intentionally directed at the United States market for Occupant Safety Restraint Systems and had a substantial and foreseeable effect on interstate

commerce by raising and fixing prices for Occupant Safety Restraint Systems throughout the United States.

207.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Occupant Safety Restraint Systems.

208.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Occupant Safety Restraint Systems have been harmed by being forced to pay inflated, supra-competitive prices for Occupant Safety Restraint Systems.

209.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

210.    Defendants and their co-conspirators' conspiracy had the following effects, among others:

(e)    Price competition in the market for Occupant Safety Restraint Systems has been restrained, suppressed, and/or eliminated in the United States;

(f)    Prices for Occupant Safety Restraint Systems sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(g)    Plaintiffs and members of the Nationwide Class who purchased Occupant Safety Restraint Systems indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

211.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Occupant Safety Restraint Systems purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

212.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

213.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

214.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

215.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Occupant Safety Restraint Systems in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

216.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Occupant Safety Restraint Systems and to allocate customers for Occupant Safety Restraint Systems in the United States.

217.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Occupant Safety Restraint

Systems at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Occupant Safety Restraint Systems sold in the United States;

(b)      allocating customers and markets for Occupant Safety Restraint Systems in the United States in furtherance of their agreements; and

(c)      participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

218.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Occupant Safety Restraint Systems.

219.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

220.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

221.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Occupant Safety Restraint Systems at supra-competitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Occupant Safety Restraint Systems.

(c)      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Occupant Safety Restraint Systems; and (2) Allocating among themselves the production of Occupant Safety Restraint Systems.

(d)      The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) Price competition in the sale of Occupant Safety Restraint Systems has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Occupant Safety Restraint Systems sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Occupant Safety Restraint Systems directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Occupant Safety Restraint Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

222.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

223.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Occupant Safety Restraint Systems prices were raised,

60

fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

224.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

61

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

225.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Maine; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs

and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

226.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

227.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

228.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

229.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business and property and are

threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint

of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Nebraska

Revised Statutes §§ 59-801, *et seq.*

230.      Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1)

Occupant Safety Restraint Systems price competition was restrained, suppressed, and

eliminated throughout Nevada; (2) Occupant Safety Restraint Systems prices were raised,

fixed, maintained and stabilized at artificially high levels throughout Nevada; (3)

Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supra-

competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected

Nevada commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured in their business and property and are

threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint

of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*  Accordingly, Plaintiffs

66

and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.

(e)     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

232.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

233.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems when they purchased vehicles containing Occupant Safety Restraint Systems, or purchased products that were otherwise of lower quality, than would have been absent the conspirators illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

234.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and

open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq.*

235.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)      During the Class Period, defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.*  Accordingly,

71

Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

237.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

238.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

239.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Utah; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4)

Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

240.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

74

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

241.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and

members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

242.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

243.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid

more for Occupant Safety Restraint Systems than they otherwise would have paid in the absence

of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states

were designed to prevent and flows from that which makes Defendants' conduct unlawful.

244.    In addition, Defendants have profited significantly from the aforesaid conspiracy.

Defendants' profits derived from their anticompetitive conduct come at the expense and

detriment of members of the Plaintiffs and the members of the Damages Class.

245.    Accordingly, Plaintiffs and the members of the Damages Class in each of the

above jurisdictions seek damages (including statutory damages where applicable), to be trebled

or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit,

including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Damages Class)

246.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint.

247.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

fraudulent acts or practices in violation of the state consumer protection and unfair competition

statutes listed below.

248.    Defendants have knowingly entered into an unlawful agreement in restraint of

trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*.

(a)    The Defendants knowingly agreed to, and did in fact, act in restraint of trade or

commerce  by affecting, fixing, controlling, and/or maintaining at non-competitive and

artificially inflated levels, the prices at which Occupant Safety Restraint Systems were

sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint System price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Occupant Safety Restraint System prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Occupant Safety Restraint Systems.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

249.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)    During the Class Period, defendants marketed, sold, or distributed Occupant Safety Restraint Systems in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)    The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, et seq., of the California Business and Professions Code, set forth above;

(d)    Defendants' acts, omissions, misrepresentations, practices, an non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)     Defendants' acts or practices are unfair to consumers of Occupant Safety Restraint Systems (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(f)     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(g)     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

(h)     The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

(i)     The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supra-competitive and artificially-inflated prices for Occupant Safety Restraint Systems (or vehicles containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)     The conduct of defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result

80

of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

250.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed or obtained in the District of Columbia.

(b)    The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.  Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Occupant Safety Restraint Systems. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing Occupant Safety Restraint Systems because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.  Defendants' conduct with regard to sales of Occupant Safety Restraint Systems, including their illegal conspiracy to secretly fix the price of Occupant Safety Restraint Systems at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.  The suppression of competition that has resulted from Defendants' conspiracy

81

has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Occupant Safety Restraint Systems.

(c)      Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels  throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(d)      As a direct and proximate result of the Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

251.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

(a)      Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Florida; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4)

Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

252.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

(a)      Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

253.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

(a)     Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(c)     Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(d)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

(e)     Certain of the Defendants have been served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the

Commonwealth of Massachusetts or not keeping assets within the Commonwealth.  More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

(f)      By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

254.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

(a)      Missouri Plaintiff and members of this Damages Class purchased Occupant Safety Restraint Systems for personal, family, or household purposes.

(b)      Defendants engaged in the conduct described herein in connection with the sale of Occupant Safety Restraint Systems in trade or commerce in a market that includes Missouri.

(c)      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

(d)      Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning defendants' unlawful activities

85

and artificially inflated prices for Occupant Safety Restraint Systems.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Occupant Safety Restraint Systems they purchased.

(e)     Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Occupant Safety Restraint Systems by making public statements that were not in accord with the facts.

(f)     Defendants' statements and conduct concerning the price of Occupant Safety Restraint Systems were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Occupant Safety Restraint Systems at prices established by a free and fair market.

(g)     Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(h)     The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(i)     As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

86

(j)     Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

255.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq*.

(a)     Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Montana; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(b)     During the Class Period, defendants marketed, sold, or distributed Occupant Safety Restraint Systems in Montana, and defendants' illegal conduct substantially affected Montana commerce and consumers.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and

members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of Mont. Code, §§ 30-14-101, *et seq*. and, accordingly, Plaintiffs

and members of the Damages Class seek all relief available under that statute.

256.     Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by

affecting, fixing, controlling and/or maintaining at non-competitive and artificially

inflated levels, the prices at which Occupant Safety Restraint Systems were sold,

distributed or obtained in New Mexico and took efforts to conceal their agreements from

Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted

"unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such

conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs

and the members of the Damages Class and the prices paid by them for Occupant Safety

Restraint Systems as set forth in N.M.S.A., § 57-12-2E.  Plaintiffs were not aware of

Defendants' price-fixing conspiracy and were therefore unaware that they were being

unfairly and illegally overcharged.  There was a gross disparity of bargaining power

between the parties with respect to the price charged by Defendants for Occupant Safety

Restraint Systems.  Defendants had the sole power to set that price and Plaintiffs had no

power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in

purchasing Occupant Safety Restraint Systems because they were unaware of the

unlawful overcharge and there was no alternative source of supply through which Plaintiffs' could avoid the overcharges. Defendants' conduct with regard to sales of Occupant Safety Restraint Systems, including their illegal conspiracy to secretly fix the price of Occupant Safety Restraint Systems at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Occupant Safety Restraint Systems.

(c)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(d)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

89

(f)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

257.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)      Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      Defendants and their co-conspirators made public statements about the prices of Occupant Safety Restraint Systems and products containing Occupant Safety Restraint Systems that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Occupant Safety Restraint Systems and products containing Occupant Safety Restraint Systems; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

(c)      Because of Defendants' unlawful trade practices in the State of New York, New York consumer class members who indirectly purchased Occupant Safety Restraint Systems were misled to believe that they were paying a fair price for Occupant Safety Restraint Systems or the price increases for Occupant Safety Restraint Systems were for

valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

(d)      Defendants knew that their unlawful trade practices with respect to pricing Occupant Safety Restraint Systems would have an impact on New York consumers and not just the Defendants' direct customers.

(e)      Defendants knew that their unlawful trade practices with respect to pricing Occupant Safety Restraint Systems would have a broad impact, causing consumer class members who indirectly purchased Occupant Safety Restraint Systems to be injured by paying more for Occupant Safety Restraint Systems than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(f)      The conduct of the defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(g)      Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(h)      During the Class Period, defendants marketed, sold, or distributed Occupant

Safety Restraint Systems in New York, and defendants' illegal conduct substantially

affected New York commerce and consumers.

(i)      During the Class Period, each of the Defendants named herein, directly, or

indirectly and through affiliates they dominated and controlled, manufactured, sold

and/or distributed Occupant Safety Restraint Systems in New York.

(j)      Plaintiffs and members of the Damages Class seek all relief available pursuant to

N.Y. Gen. Bus. Law § 349 (h).

258.      Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)      Defendants agree to, and did in fact, act in restraint of trade or commerce by

affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels,

the prices at which Occupant Safety Restraint Systems were sold, distributed or obtained

in North Carolina and took efforts to conceal their agreements from Plaintiffs and

members of the Damages Class.

(b)      Defendants' price-fixing conspiracy could not have succeeded absent deceptive

conduct by Defendants to cover up their illegal acts.  Secrecy was integral to the

formation, implementation and maintenance of Defendants' price-fixing conspiracy.

Defendants committed inherently deceptive and self-concealing actions, of which

Plaintiffs could not possibly have been aware.  Defendants and their co-conspirators

publicly provided pre-textual and false justifications regarding their price increases.

Defendants' public statements concerning the price of Occupant Safety Restraint Systems

created the illusion of competitive pricing controlled by market forces rather than supra-

competitive pricing driven by Defendants' illegal conspiracy.  Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders, conducting meetings and conversations in secret, confining the plan to a small group of higher-level officials at each company and avoiding the creation of documents which would reveal the antitrust violations.

(c)      The conduct of the defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)      Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(e)      During the Class Period, defendants marketed, sold, or distributed Occupant Safety Restraint Systems in North Carolina, and defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(f)      During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Occupant Safety Restraint Systems in North Carolina.

(g)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

259.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a)     Members of this Damages Class purchased Occupant Safety Restraint Systems for personal, family, or household purposes.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in Rhode Island.

(c)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Occupant Safety Restraint Systems. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that defendants' Occupant Safety Restraint Systems prices were competitive and fair.

(d)     Defendants' unlawful conduct had the following effects: (1) Occupant Safety Restraint Systems price  competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(e)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by defendants' willful and deceptive conduct, as described herein.

(f)     Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of Occupant Safety Restraint Systems, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Occupant Safety Restraint Systems at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Occupant Safety Restraint Systems they purchased.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

260.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Occupant Safety Restraint Systems were sold, distributed, or obtained in Vermont.

(b)    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Occupant Safety Restraint Systems.  Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that defendants' Occupant Safety Restraint Systems prices were competitive and fair.

(c)    Defendants' unlawful conduct had the following effects:  (1) Occupant Safety Restraint Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Occupant Safety Restraint Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Occupant Safety Restraint Systems.

(d)    As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive

96

commercial practices as set forth above.  That loss was caused by defendants' willful and deceptive conduct, as described herein.

(e)      Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of Occupant Safety Restraint Systems, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Occupant Safety Restraint Systems at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

261.      Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

262.      Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*, except for the state of California.  Plaintiffs also bring this claim under the laws of South Carolina.

263.      As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Occupant Safety Restraint Systems.

215.      Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs of the members of the Damages Class for Occupant Safety Restraint Systems.

216.     Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

217.     Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased vehicles containing Occupant Safety Restraint Systems and Occupant Safety Restraint Systems subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

218.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

219.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

98

(d)      Acts of unjust enrichment by Defendants as set forth herein.

220.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

221.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

222.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

223.    Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

224.    Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

225.    Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

226.    Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.


DATED: March 30, 2017                    */s/ Omar Ochoa*

Steven N. Williams
Elizabeth Tran
Demetrius X. Lambrinos
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
swilliams@cpmlegal.com
etran@cpmlegal.com
dlambrinos@cpmlegal.com

Hollis Salzman
Bernard Persky
William V. Reiss
**ROBINS KAPLAN LLP**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
BPersky@RobinsKaplan.com
WReiss@RobinsKaplan.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Chanler Langham
Omar Ochoa

**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
toxford@susmangodfrey.com
clangham@susmangodfrey.com
oochoa@susmangodfrey.com

*Interim Co-Lead Class Counsel for the Proposed
End-Payor Plaintiff Class*

E. Powell Miller
Devon P. Allard
**THE MILLER LAW FIRM, P.C.**
The Miller Law Firm, P.C.
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
epm@millerlawpc.com
dpa@millerlawpc.com

*Interim Liaison Counsel for the Proposed End-
Payor Plaintiff Classes*

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


DATED: March 30, 2017                    */s/ Omar Ochoa*
                                         Steven N. Williams
                                         Elizabeth Tran
                                         Demetrius X. Lambrinos
                                         **COTCHETT, PITRE & McCARTHY, LLP**
                                         San Francisco Airport Office Center
                                         840 Malcolm Road, Suite 200
                                         Burlingame, CA 94010
                                         Telephone: (650) 697-6000
                                         Facsimile: (650) 697-0577
                                         swilliams@cpmlegal.com
                                         etran@cpmlegal.com
                                         dlambrinos@cpmlegal.com

                                         Hollis Salzman
                                         Bernard Persky
                                         William V. Reiss
                                         **ROBINS KAPLAN LLP**
                                         601 Lexington Avenue, Suite 3400
                                         New York, NY 10022
                                         Telephone: (212) 980-7400
                                         Facsimile: (212) 980-7499
                                         HSalzman@RobinsKaplan.com
                                         BPersky@RobinsKaplan.com
                                         WReiss@RobinsKaplan.com

                                         Marc M. Seltzer
                                         Steven G. Sklaver
                                         **SUSMAN GODFREY L.L.P.**
                                         1901 Avenue of the Stars, Suite 950
                                         Los Angeles, CA 90067-6029
                                         Telephone: (310) 789-3100
                                         Facsimile: (310) 789-3150
                                         mseltzer@susmangodfrey.com
                                         ssklaver@susmangodfrey.com

                                         Terrell W. Oxford
                                         Chanler Langham
                                         Omar Ochoa

**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
toxford@susmangodfrey.com
clangham@susmangodfrey.com
oochoa@susmangodfrey.com

*Interim Co-Lead Class Counsel for the Proposed End-Payor Plaintiff Class*

E. Powell Miller
Devon P. Allard
**THE MILLER LAW FIRM, P.C.**
The Miller Law Firm, P.C.
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
epm@millerlawpc.com
dpa@millerlawpc.com

*Interim Liaison Counsel for the Proposed End-Payor Plaintiff Classes*